# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EGON OLDENDORF (LIBERIA), INC.<br>80 Broad Street<br>Monrovia, Liberia<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>MING JADE INVESTMENTS, S.A.<br>c/o Amicorps B.V.I. Limited<br>Caracasbaaiweg 11<br>Box 6050 Curacao, Netherland Antilles,<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO.:  05-2443 |

## UNITED STATES' MOTION TO SET ASIDE
## ORDER OF GARNISHMENT

COMES NOW the United States of America, on behalf of its agency, the United States Department of Agriculture, and respectfully moves this Honorable Court to set aside the Order of Garnishment entered in this matter on December 21, 2005, as being precluded by statute.  This motion is based on the attached Memorandum of Law and the attachments thereto.

WHEREFORE the United States prays that this court will set aside the referenced Order of Garnishment, and award the United States its costs and such other relief as this Court deems just and proper.

Dated: January 17, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PETER F. FROST
Senior Admiralty Counsel
Civil Division, Torts Branch
United States Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271
Tel:   202-616-4031
Fax:  202-616-4002
Email:  Peter.Frost@usdoj.gov

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EGON OLDENDORF (LIBERIA), INC.<br>80 Broad Street<br>Monrovia, Liberia<br><br>Plaintiff,<br><br>v.<br><br>MING JADE INVESTMENTS, S.A.<br>c/o Amicorps B.V.I. Limited<br>Caracasbaaiweg 11<br>Box 6050 Curacao, Netherland Antilles,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO.:  05-2443 |

## MEMORANDUM IN SUPPORT OF
## UNITED STATES' MOTION TO SET ASIDE
## ORDER OF GARNISHMENT

On December 21, 2005, Plaintiff presented this Honorable court with a proposed

Order of Garnishment, purporting to garnish monies due Defendant Ming Jade

Investments from any and all debtors within the jurisdiction of the court.  The Order was

duly executed and a copy provided to the United States Department of Agriculture, from

whom Plaintiff seeks to garnish monies due Defendant.  The Order must be set aside and

the United States relieved from complying with it, however, because orders of

garnishment against the responsible United States agency are precluded by statute.

1

STATEMENT OF THE CASE

Plaintiff in this case seeks to obtain $696,903.89 in freight payments currently due Defendant Ming Jade Investments, Inc., from the Commodity Credit Corporation ("CCC"), an agency of the United States within the United States Department of Agriculture (See Declaration of Peter F. Frost, Attachment 1). CCC's involvement with this matter arises out of the Food for Progress Act of 1985, 7 U.S.C. § 1736o. This statute authorizes CCC to make agricultural commodities available to the President for donation overseas to assist developing countries. The President's functions under this statute have been delegated to the Secretary of Agriculture by section 3(g) of Executive Order 12752, dated February 25, 1991, 56 FR 8255.Program regulations appear at 7 C.F.R part 1499.

On September 12, 2005, CCC entered into a Food for Progress Agreement ("FFP agreement") with the government of Bolivia (Attachment 1, Exhibit A). The agreement provided for the donation of wheat to support assistance programs in Bolivia. Id. Under the Food for Progress program, the Government of Bolivia, also referred to as the "Cooperating Sponsor," is required to contract for ocean transportation to carry the donated commodities; however, the CCC agrees to pay the resultant ocean freight charges directly to the ocean carrier when requested to do so. See Att. 1, Exh. A, Part II, Item II; 7 C.F.R. ¶¶ 1499.7(b); 1499.8(g).

2

After signing the FFP agreement, the Government of Bolivia procured the necessary ocean transportation by issuing a freight invitation for bids through its agent, International Services Corp. Bolivia accepted Ming Jade's bid for carriage of the donated wheat and, on November 9, 2005, entered into a charter party for shipment on the M/V COMET (Attachment 1, Exh. B). It is the United States' understanding that the cargo has arrived at its discharge port and sixty per cent of total freight payments would be due, but for the Order of Garnishment at issue here.[1]

## ANALYSIS

This Honorable Court is without jurisdiction to issue the pending Order of Garnishment. As indicated above, CCC is an agency and instrumentality of the United States within the Department of Agriculture. CCC is a corporate entity, chartered by federal statute, 15 U.S.C. §§ 714, et seq. Section 4(c) of the CCC Charter Act, 15 U.S.C. § 714b(c), provides that the CCC "may sue and be sued, but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Corporation or its property." Consequently, CCC accounts are not subject to the garnishment contemplated, nor may CCC be otherwise enjoined from paying any freight

---

We note that the M/V TOSCANA was substituted for the M/V COMET by Addendum No. 1 to the charter party (See Att.1, Exh. B), and that a second Addendum to the charter party, dated December 12, 2005, provides for payments to be made to Sonchia Chartering Co., rather than Ming Jade. Arguably, then, the pending Order does not preclude the United States' paying freight due to Sonchia Chartering Co., as the Order addresses only payments to Ming Jade.

3

charges that may be due.  See, Central Production Credit Assoc. v. Raymon, 732 F.Supp.

986 (E.D. Ark. 1990) (attempted garnishment in non-maritime application denied).

The statutory prohibition against garnishment of CCC accounts and payments

effectuates the public policy goal of ensuring that the public purposes of the various CCC

activities are, in fact, realized.  This is most readily apparent in the instant case in which

humanitarian feeding or foreign country developmental activities may be delayed or

negated by the failure of entities such as ocean carriers to discharge their obligations in

the face of an attachment or garnishment.  The CCC Charter Act's legislative history

explicitly recognizes the danger of attachments and garnishment orders' interfering with

legitimate public purposes.  It notes that "[t]he availability of any of these judicial

processes would not afford to creditors or other persons suing the Corporation any benefit

which would outweigh the possible detriment to the Government through hindrance or

obstruction of the Corporation's operations." 1948 U.S.C.C.A.N. at 2148.  Accordingly,

both by Congressional intent and effect of the statute, the pending Order of Garnishment

is void and must be set aside.

Conclusion

For the reasons noted above, the pending Order of Garnishment should be set

aside.

Dated: January 17, 2006

4

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

_____
PETER F. FROST
Senior Admiralty Counsel
Civil Division, Torts Branch
United States Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271
Tel:  202-616-4031
Fax:  202-616-4002
Email:  Peter.Frost@usdoj.gov

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| EGON OLDENDORF (LIBERIA), INC.<br>80 Broad Street<br>Monrovia, Liberia<br><br>       Plaintiff,<br><br>       v.<br><br>MING JADE INVESTMENTS, S.A.<br>c/o Amicorps B.V.I. Limited<br>Caracasbaaiweg 11<br>Box 6050 Curacao, Netherland Antilles,<br><br>       Defendant. | CIVIL NO.: 05-2443 |

## DECLARATION OF PETER F. FROST

I, Peter F. Frost, do depose and say as follows:

1. I am attorney for the United States Department of Justice, assigned to handle litigation in the above-captioned matter. I make the statements herein on the basis of personal knowledge or on the basis of information that became known to me in the course and scope of my official duties.

2. Attached hereto as Exhibit A is a copy of an Agreement Between the Government of the United States and the Government of Bolivia for the Donation of Agricultural Commodities Under the Food for Progress Act.

3. Attached hereto as Exhibit B are copies of Charter Party documents between the Government of Bolivia and Ming Jade Investments, initially agreeing to shipment of

**Attachment 1**

cargo on the M/V COMET.  The included addenda to that Charter Party reflect that, on

November 11, 2005, the M/V TOSCANA was substituted for the M/V COMET and that

on December 12, 2005, the payee was changed from Ming Jade Investments S.A. of

Curacao, to Sonchia Chartering Company of Colorado.

FURTHER AFFIANT SAYETH NOT

Executed under penalty of perjury this 17th day of January, 2006.

_____
Peter F. Frost

2

*COPY FOR YOUR INFORMATION*

OGSM:  FGR-511-2005/189-00
COUNTRY: BOLIVIA

*handwritten: Wheat 13,000 / - 3,200 (1) / 9,800*

# AGREEMENT BETWEEN
## THE GOVERNMENT OF THE UNITED STATES OF AMERICA
### AND
## THE GOVERNMENT OF BOLIVIA
## FOR THE DONATION OF AGRICULTURAL COMMODITIES
## UNDER THE FOOD FOR PROGRESS ACT

**PREAMBLE**

The Government of the United States of America, acting through the Commodity Credit Corporation (hereafter referred to as CCC), and the Government of Bolivia (hereafter referred to as the Cooperating Sponsor), acting through the Ministry of Finance;

In an effort to use the food resources of the United States in support of countries that have made commitments to introduce or expand free enterprise elements in their agricultural economies through changes in commodity prices, marketing, input availability, distribution, and private sector involvement;

Recognizing the extent to which the Cooperating Sponsor is committed to and is carrying out policies that promote economic freedom; private, domestic production of commodities for domestic consumption; and the creation and expansion of efficient domestic markets for the purchase and sale of such commodities; and

Desiring to set forth the understandings that will govern the supply of agricultural commodities to the Cooperating Sponsor for distribution in Bolivia pursuant to the Food for Progress Act of 1985, as amended;

Agree as follows:

## PART I
### GENERAL PROVISIONS

A. This Agreement is subject to the terms and conditions set forth in 7 C.F.R. Part 1499, except as may be specifically provided herein.

B. CCC agrees to provide to the Cooperating Sponsor the agricultural commodities, and quantities thereof, specified in Part II, Item I (hereafter referred to as the "commodities") for assistance in Bolivia and, to the extent specifically included in Part II, Items II and III, pay ocean transportation and other costs associated with providing the commodities.

**Exhibit A**

C. The Cooperating Sponsor agrees to use the commodities only in accordance with this Agreement and the approved Plan of Operation, Attachment A, which is attached hereto and made a part of this Agreement, and shall not sell or barter the commodities except as specified in Attachment A or otherwise specifically agreed in writing by CCC.

D. Except as may be authorized by CCC, all deliveries of the commodities will be made within the supply period(s) specified in Part II, Item I.

E. CCC shall endeavor to provide to the Cooperating Sponsor the maximum quantities of the commodities specified in Part II. CCC may, however, provide quantities of commodities that are less than the maximum quantities specified in Part II, to the extent that the total export value of the maximum quantities would exceed the amount estimated in Part II.

F. The CCC and the Cooperating Sponsor shall take maximum precautions to ensure that the donation of agricultural commodities pursuant to this Agreement will not displace usual marketings of the United States in these commodities or disrupt world prices of agricultural commodities or normal patterns of commercial trade with other countries. In implementing this provision, the Cooperating Sponsor shall:

1. Take all possible measures to ensure that total commercial imports from the United States and other countries into the importing country paid for with the resources of the importing country will equal at least the quantities of agricultural commodities specified in the Usual Marketing Table set forth in Part II, Item IV below, during each import period specified in the table and during each subsequent comparable period in which commodities provided under this Agreement are being delivered;

2. Take all possible measures to prevent the sale, diversion in transit, or transshipment to other countries, or the use for other than domestic purposes, of the commodities donated pursuant to this Agreement (except where such sale, diversion in transit, transshipment or use is specifically approved by CCC); and

3. Take all possible measures to prevent the export of any commodity of either domestic or foreign origin, as defined in Part II, Item V, Paragraph B, during the export limitation period specified in Part II, Item V, Paragraph A (except as may be specified in Part II or where such export is otherwise specifically approved by CCC).

G. This Agreement is subject to the availability, during each fiscal year to which this Agreement applies, of the necessary commodities.

2

## PART II
## PARTICULAR PROVISIONS

Item I - Commodities

A. The commodities to be made available under this Agreement are as follows:

| Commodity | Supply Period (U.S. Fiscal Year) | Maximum Quantity (Metric Tons) | Estimated Value (U.S. Millions) |
|---|---|---|---|
| Wheat | 2005 | 13,000 | 2.4 |
| Estimated Transportation | | | 1.2 |
| Total Estimated Export Value | | | 3.6 |

The maximum quantities may not be exceeded.

B. The commodities to be provided by CCC will be in accordance with the specifications in Attachment B, attached hereto and made a part of this Agreement.

Item II - Payment of Costs

The payment of all costs associated with the processing, packaging, transporting, handling, and other charges incurred in the distribution of the commodities will be apportioned as follows:

A. CCC agrees to donate the commodities without charge and pay the following costs after delivery to the Cooperating Sponsor: ocean transportation to the designated discharge port(s) and reasonable transportation costs incurred in moving the commodities from the designated discharge port(s) to the point(s) of initial discharge.

B. The Cooperating Sponsor agrees to arrange for the following: ocean transportation and transportation, handling, storage and distribution in Bolivia. The Cooperating Sponsor will arrange for transportation from the designated discharge port(s) to the point(s) of initial discharge using one of the following methods, as approved by CCC:

1. Through bill of lading, or

2. Direct contracts with suppliers of services.

a. The Cooperating Sponsor will submit an invoice to CCC indicating the actual costs it has incurred. This invoice will be accompanied by documentation supporting the amounts claimed and a statement from the Cooperating Sponsor that it considers the costs to be reasonable. The Cooperating Sponsor will send all documents to: Director, Operations Division, USDA/FAS, Stop 1035, 1400 Independence Avenue, S.W., Washington, D.C. 20250-1035.

3

b. The Cooperating Sponsor will, to the extent practicable, inform CCC of costs to be incurred prior to incurring such costs.

c. CCC will make payment to the Cooperating Sponsor in dollars.

Item III - Ocean Carrier Loss and Damage

A. The provisions of 7 C.F.R. section 1499.15(d), <u>Ocean carrier loss and damage</u>, will not apply to the ocean transportation of any commodities which are to be sold in accordance with the Agreement if the Cooperating Sponsor notifies CCC prior to delivery of the commodities to the Cooperating Sponsor that: (1) the commodities have been sold on terms that require full payment based upon bill of lading quantities, or (2) the Cooperating Sponsor is the purchaser of insurance against marine cargo loss and damage (including general average losses) for at least the landed value of the commodities.

B. In the event that 7 C.F.R. section 1499.15(d), <u>Ocean carrier loss and damage</u>, does apply to the ocean transportation of commodities provided under this Agreement, CCC will pay for an independent cargo surveyor to attend the discharge of the cargo and prepare a report of its findings. Unless CCC determines otherwise, the Cooperating Sponsor will arrange for an independent cargo surveyor in accordance with 7 C.F.R. section 1499.15(c).

Item IV - Usual Marketing Table

| Commodity | Import Period (U.S. Fiscal Year) | Usual Marketing Requirement (Metric Tons) |
|-----------|----------------------------------|-------------------------------------------|
| Wheat | 2005 | 336,400 |

Item V - Export Limitations

A. The export limitation period shall be the U.S. fiscal year 2005 or any subsequent U.S. fiscal year during which the commodities donated under this Agreement are being imported.

B. For the purpose of Part I, Paragraph F.3, the commodities which may not be exported are: wheat, wheat flour, rolled wheat, semolina, farina, bran, or bulgur (or the same or similar product(s) under a different name).

Item VI - Reports

A. The Cooperating Sponsor shall submit semiannual logistics reports (Form CCC-620) required by 7 C.F.R. Section 1499.16(c)(1) and, where applicable, monetization reports (Form CCC-621) required by 7 C.F.R. Section 1499.16(c)(2) as follows:

For agreements signed October 1 through March 31, the first report(s) is due by the following May 16 and shall cover the period from the agreement signing date through March 31. For Agreements signed April 1 through September 30, the first report(s) is due by the following November 16 and shall cover the period from the agreement signing date through September 30.

4

Thereafter, logistics reports shall cover each subsequent six (6) month period until all commodities have been distributed or sold. Monetization reports, where applicable, shall also cover each subsequent six (6) month period until all proceeds from commodity sales under this Agreement have been disbursed.

B. The Cooperating Sponsor shall submit a report covering the supply period specified in Part II, Item I, and containing: statistical data on imports by country of origin to meet the Usual Marketing Requirement(s) specified in Part II, Item IV; a statement of the measures taken to implement the provisions of Part I, Paragraphs F.2 and F.3; and statistical data on exports by country of destination of commodities the same as or like those imported under this Agreement, as specified in Part II, Item V.

C. All reports to CCC required to be made under this Agreement shall be made to the Director, Programming Division, FAS/USDA, 1400 Independence Avenue, S.W., Stop 1034, Washington, D.C. 20250-1034.

**PART III**
**FINAL PROVISIONS**

This Agreement shall enter into force upon signature.

In witness whereof, the respective representatives, duly authorized for the purpose, have signed the Agreement.

Done in duplicate, in the English and Spanish languages. In the case of discrepancies, the English language text shall prevail.

**FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA**

By:

Name: David Greenlee

Title: Ambassador, United States Embassy in Bolivia

Date: 19-Aug-2005

**FOR THE GOVERNMENT OF BOLIVIA**

By:

Name: Waldo Gutierrez Iriarte

Title: Minister of Finance

Date: 15-Aug-2005

**FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA**

By:

Name: W. Kirk Miller

Title: General Sales Manager
and Vice President
Commodity Credit Corporation

Date: September 12, 2005

6

**Attachment A**
**P.L. 480, Food for Progress**
**Government of Bolivia**
**FY 2005**

1.  **Name and Address of Applicant:**

Government of Bolivia
Ministry of Finance
Centro de Comunicaciones La Paz, Piso 11
La Paz, Bolivia

**2. Country of Donation:**

Bolivia

**3 and 4. Kind/Quantity of Commodity Requested and Delivery Schedule:**

| Commodity | Use of Commodity | Quantity in Metric Tons (MT) | Delivery at U.S. Port |
|-----------|------------------|------------------------------|-----------------------|
| Wheat     | Monetization     | 13,000                       | August – September 2005 |
| **Total** |                  | **13,000**                   |                       |

**5. Program Description:**

(a) Activity Objectives

The Government of Bolivia (GOB), through the PL-480 Secretariat, will monetize approximately 13,000 MT of wheat and use the proceeds to improve the productivity and incomes of small agricultural and livestock producers by carrying out activities described in paragraph 6(e), below. Projects implemented under this Agreement will improve and enhance the agricultural sector's capacity to benefit from liberalized regional and global agricultural trade.

(b) Method of Choosing Beneficiaries

The GOB will target small and medium-size agricultural and livestock producers. Beneficiaries will be selected in accordance with criteria specified for each project. The PL-480 Secretariat, with guidance from the PL-480 Advisory Board, will determine the eligibility criteria of beneficiaries. All eligible producers will have equal opportunity to participate.

(c) Program Administration

    (1) PL-480 Secretariat

The PL-480 Secretariat is an independent and autonomous project management unit within the Ministry of Finance responsible for receiving, administering and dispensing funds generated from the monetization of donations from the Government of the United States through USDA. The PL-480 Secretariat will act on behalf of and be accountable to the GOB. The PL-480 Secretariat will receive and monetize the wheat donated under this Agreement and deposit the proceeds from the sale of the wheat into a separate interest-bearing account in one or more private banks. The PL-480 Secretariat will be responsible for nominating specific projects described in paragraph 6(e), below, which satisfy the objectives of this Agreement and will forward them to the PL-480 Advisory Board for approval. Once approved, the PL-480 Secretariat will be responsible for disbursing the funds to the appropriate project and ensuring that proper financial controls are in place and being adhered to by the entities responsible for carrying out each project. The PL-480 Secretariat will be responsible for preparing all required reports under this Agreement.

    (2) PL-480 Advisory Board

The PL-480 Advisory Board will be comprised of two representatives from the Ministry of Agriculture, the Agricultural Attaché of the U.S. Embassy and one other representative of the U.S. Embassy, or their designee. The PL-480 Advisory Board will oversee the work of the PL-480 Secretariat in its implementation of the terms of this Agreement, including approving the annual budget of the PL-480 Secretariat and specific projects to be funded from the monetization proceeds. Each member of the PL-480 Advisory Board has a vote. Decisions will be based on majority vote of the PL-480 Advisory Board; however, in the absence of a majority decision, the decision of the U.S. Agricultural Attaché will be controlling.

(d) Activity Budgets

All costs for this program not covered by resources provided by the USDA will be borne by the Government of Bolivia, through the appropriate implementing agency for each project.

(e) Recipient Agency

There are no recipient agencies.

(f) Governmental or Non-governmental Entities

The GOB will be entirely responsible for carrying out projects and activities and the PL-480 Secretariat will monitor and evaluate the implementation of projects.

2

(g) Method of Educating Consumers

The Secretariat will take appropriate public action, including radio, television or newspaper advertisement, notifying the public of the donation and its benefits.

(h) Criteria for Measuring Progress

Timetable for Use of Sales Proceeds

| Time Period | Activity |
|---|---|
| July-August 2005 | Local Bidding of Wheat |
| August-October 2005 | Loading of Wheat in U.S. |
| November 2005-February 2006 | Receipt and Monetization of Wheat |
| April 2006 | Development of Project Plans |
| September 2006 | Disbursement of Funds |
| September 2008 | Completion of Projects and Submission of Final Report to USDA |

**6. Use of Funds or Goods and Services Generated:**

(a) Quantity and Type of Commodity

13,000 MT of wheat

(b) Impact on other sales

Bolivia produces small amounts of wheat in the eastern region of the country. The majority of its wheat/wheat flour consumption need is imported, including donations. The wheat donated under this program will be milled and consumed in the highlands around the La Paz area. Bolivia imports wheat commercially and is capable of producing wheat, however, the amounts imported (300,000 MT estimated for CY 2005) and produced (60,000 estimated for CY 2005) are not sufficient to meet Bolivia's consumption needs. The wheat donation represents less than 5 percent of total wheat import requirements, and would have minimal impact on commercial sales.

(c) Amount of Sales Proceeds Anticipated

| Commodity | Amount to be sold (MT) | Estimated Sales Price per MT | Total Estimated Proceeds |
|---|---|---|---|
| Wheat | 13,000 | $231 (c&f) | $3,000,000 |

(d) Private Sector Participation in the Sale of the Commodities

Competitive private sector participation in the storage, marketing and transportation of the commodity made available under this Agreement will be encouraged by allowing the private sector in Bolivia to purchase, receive and distribute 100 percent of the commodity. Furthermore, the PL-480 Secretariat will encourage competitive marketing practices by selling the wheat on public bids.

3

(e) Use of Sale Proceeds

| Expense Categories | Equivalent Dollar Amount of Proceeds |
|---|---|
| Improve Agricultural Trade and Productivity | $1,000,000 |
| Trade Capacity Building | $1,000,000 |
| Improve Agricultural Marketing Chain | $750,000 |
| Norman E. Borlaug Fellowship Program | $100,000 |
| Monetization, management and control expenses | $150,000 |
|  |  |
| Total | $3,000,000 |

Improve Agricultural Trade, Infrastructure and Productivity

These projects will strengthen agricultural development of small and medium-size farmers throughout Bolivia, with a particular emphasis on the highland regions. These projects should include, but are not limited to, projects that expand irrigation and water systems to enhance agricultural production, strengthen seed banks, and improve Bolivia's agricultural productivity, infrastructure, marketing capacity and other factors affecting the food chain from farm to table.

Trade Capacity Building

A portion of the proceeds will be used to support Agricultural Trade Capacity Building (TCB) activities in Bolivia based on Bolivia's TCB national strategy. The activities will extend the benefits of trade to Bolivia's rural sectors, especially small and medium- size farmers and provide support for trade-related aspects of agriculture technology development and agribusiness. The funding will support trade-related aspects of agricultural technology development and agribusiness that are based on Bolivia's national strategy as developed in the TCB discussions with the United States. The TCB activities may include, but are not limited, to improving sanitary/phytosanitary standards, designing environmental standards and technology, promoting technology transfer to enhance trade and developing the necessary infrastructure for trade.

Improve the Agricultural Marketing Chain

A portion of the proceeds will be used to address priority areas of strengthening the viability of agricultural enterprises in Bolivia and the institutions which support these enterprises and initiatives, and which improve the agricultural marketing chain. These programs are not limited to, but will focus, on projects in the highland regions of Bolivia.

Norman E. Borlaug Fellowship Program

The GOB will fund research fellowships, which will be referred to as Norman E. Borlaug International Agricultural Science and Technology Fellows. Fellows will pursue short-term (approximately 6-12 week) training programs, to be conducted at either an international agricultural research center of the Consultative Group for International Agricultural Research (CGIAR), or any one of a variety of institutions including U.S. Land Grant Universities, private sector organizations, and U.S.

4

Government agencies. This training opportunity will be made available to researchers, scientists, faculty members and policy and regulatory officials specializing on agricultural topics. The GOB will, in consultation with and subject to the approval of the U.S. Agricultural Attaché, nominate fellows to participate in this training, and final selection will be made by USDA/FAS in Washington. The GOB will consult with the U.S. Agricultural Attaché to finalize the details of the fellowship program including the transfer of funds to support the fellowship.

PL-480 Secretariat Funding

Approximately $150,000 of the proceeds will be used for expenses related to the monetization, administration and the implementation of this Agreement by the PL-480 Secretariat.

(f) Procedures for Assuring Receipt and Deposit of Sale Proceeds

The PL-480 Secretariat will receive payment for the wheat from wheat millers through an irrevocable letter of credit, which shall be confirmed to the PL-480 Secretariat in advance of the loading of the wheat on vessels in the United States. Purchasers will have up to 240 days after receipt of the wheat at the port to make final payment. The PL-480 Secretariat will deposit funds received immediately into a separate account established only for Food for Progress funds. The account shall be under the sole control of the PL-480 Secretariat for disbursement in support of uses identified in this Agreement in accordance with the GOB.

**7. Distribution Methods**

(a) Description of Transportation and Storage

Bolivia is a land-locked country. The donated commodity may be transported to Arica, Chile, and/or Matarani, Peru, seaports of discharge for Bolivia. Off-loading facilities at the ports exceed 50,000 MT, more than adequate to receive the quantity of wheat being donated under this Agreement. Storage facilities at the mills exceed 100,000 MT, more than sufficient for the 13,000 MT of wheat to be shipped under this Agreement.

(b) Description of any Reprocessing or Repackaging

There will be no reprocessing and re-packing of the commodity by the GOB.

(c) Logistics Plan

The ports of Arica and/or Matarani have adequate facilities to handle the quantity of wheat being donated under this Agreement, including at least 30,000 metric tons of storage space at privately-owned storage facilities that will be available when the wheat arrives.

**8. Duty Free Entry**

The buyers will be responsible for paying all import duties and taxes associated with the shipment of wheat under this Agreement. Tariffs and taxes will be paid based on the price at which the wheat is sold in Bolivia.

**9. Economic Impact**

Bolivia produces about 60,000 MT per year in the eastern region of the country, where it is milled and consumed. An analysis of commercial imports, local production, and consumption needs shows that Bolivia's production of 110,000 MT and average imports of 336,400 MT are not sufficient to meet consumption needs of 455,000 MT. The 13,000 MT of wheat donated under this program will help Bolivia meet its consumption needs. The wheat will be delivered to mills in La Paz and will have no impact on local production or prices. The donation will not have any significant impact on commercial imports given the relatively small quantity being donated.

**ATTACHMENT B**
**COMMODITY SPECIFICATIONS**
**WHEAT**

## COMMODITY FACT SHEET

| | |
|---|---|
| 1. Class/Grade: | Hard Red Winter |
| 2. Grade: | U.S. No. 2 or better |
| 3. Protein (Min): | 12.0 % (based on 12.0% moisture) |
| 4. Moisture (Max): | 13.0% |
| 5. Dockage (Max): | 0.6% |
| 6. Test weight lbs/bu (Min): | 58.0 |
| 7. Falling number (Min): | 300 |
| 8. Wheat of Other Classes (Max): | 3.0% |
| 9. Total Defects (Max): 1/ | 3.5% |

1/ Includes damaged kernels, foreign material and shrunken and broken kernels.

## PACKAGING

Bulk shipment.

Source:  USDA:FSA:CPPAD:EPB January, 2005 (Contact 202-690-0194)

**INTERNATIONAL SERVICES CORPORATION**
1000 K STREET, N. W.
WASHINGTON, D. C. 20006

TELEFAX
(000) 200-1100
RCA 240078

TELEPHONE
AREA CODE 202
700-0400
FMC License 17008F

December 12, 2005

Addendum No. 2

Reference is made to the Charter Party dated November 9, 2005 between Ming Jade Investments S.A., Cuacao, Owner of M/V Comet, and the Government of Bolivia, Charterers.

It is this day mutually agreed and understood that the freight party payable in Clause 4 of the Charter Party is changed:

Sonchia Chartering Co. of Colorado, instead of Ming Jade Investments S.A., Curacao.

Freight Remittance details are as follows:

American National Bank
Telluride, Colorado
ABA # 107001232
Account # 70401215
Beneficiary: Sonchia Chartering Co. of Colorado

All other terms and conditions of the Charter Party remain unchanged and in full force and effect.

Owners:

Ming Jade Investment

By: _____

SONCHIA CHARTERING COMPANY
OF COLORADO, INC.

Charterers:

Government of Bolivia
By: International Services Corp.
Wash., D.C. (as agents only)

By: _____

Mariano Echevarria
President

**Exhibit B**

ORIGINAL

## INTERNATIONAL SERVICES CORPORATION

1629 K STREET, N. W.

WASHINGTON, D. C. 20006

TELEFAX
(202) 296-1160
RCA 248375

TELEPHONE
AREA CODE 202
785-3400
FMC License 17688F

November 11, 2005

Addendum No. 1

Reference is made to the Charter Party dated November 9, 2005, between Ming Jade Investments S.A. Curacao, Owner of M/V Comet, and the Government of Bolivia, Charterers.

It is this day mutually agreed and understood that the M/V Comet will be substituted by the M/V Toscana.

Vessel Details:

M/V Toscana, Bulk Carrier, Built 1997
Maltese Flag, 32,617 mt DWT on Abt 11.65 M SW,
LOA 173.60 M, Beam 27.70 M, 4 x 35 T Cranes,
GRT 23,253, NRT 11,946, 8 Holds / 8 Hatches
Classed Highest DNV

ETA: Houston, TX Abt November 28, 2005 AGW/WP/UCE

All other terms and conditions of the Charter Party remain unchanged and in full force and effect.

Owners:

Charterers:

GOVERNMENT OF BOLIVIA
By: International Services Corp.,
Wash., D.C. (as agents only)

SONCHIA CHARTERING COMPANY
OF COLORADO, INC.

By: _____

TIM JILEK

By: _____

Mariano Echevarria
President

# ORIGINAL

APPROVED BALTIMORE BERTH GRAIN CHARTER PARTY
AS ADAPTED BY THE GOVERNMENT OF BOLIVIA
FOR FOOD FOR PROGRESS PROGRAM
VESSEL LOAD/BERTH TERMS DISCHARGE/THROUGH BILL OF LADING DELIVERY
OCTOBER 2002

Washington, D.C. **NOVEMBER 9, 2005**

IT IS THIS DAY MUTUALLY AGREED between **MING JADE INVESTMENTS S.A. CURACAO**,

hereinafter referred to as Owners of the **COMET** of **MALTESE FLAG REGISTRY**,

built in **1997** at **JAPAN** of **10,095** net tons of 2,240 lbs. total

deadweight or thereabout, on a summer draft of **8 M** ins salt water, and

guaranteed to lift **3,200 METRIC TONS MINIMUM/MAXIMUM** ~~quantity at Owners' option~~,

classed **HIGHEST**, in **NK**, now trading, and the SECRETARIA EJECUTIVA P.L.480,

hereinafter referred to as Charterers, on behalf of the ASOCIACION DE INDUSTRIALES

MOLINEROS, LA PAZ, BOLIVIA.

    1.  That the said vessel being tight, staunch, strong and in every way

fitted for the voyage shall with all convenient speed sail and proceed to

**ONE (1) OR TWO (2) SAFE BERTH(S) ONE (1) OR TWO (2) SAFE PORTS U.S. GULF**  and there

load, always afloat, a full and complete cargo / part cargo, in bulk, subject to

limits above guaranteed, of  **HARD RED WINTER WHEAT IN BULK**.

2.  Vessel to load under inspection of National Cargo Bureau, Inc. and a Grain

Inspector holding a license issued by the U.S. Department of Agriculture pursuant to

the U.S. Grain Standards Act, in U.S.A. port(s), at her expense, and to comply with

their rules, not exceeding what she can reasonably stow and carry over and above her

cabin, tackle , apparel, provisions, fuel and furniture, and being so loaded shall

therewith proceed to deliver the same under through Bill(s) of Lading via

**MATARANI, PERU**  (transit port[s]) to point(s) of initial discharge in  **LA PAZ**,

Bolivia as follows: **(A) MOLINO ANDINO, KM. 17 CARRETERA A ORURO, EL ATO, LA PAZ, BOLIVIA; (B) SOCIEDAD INDUSTRIAL MOINERA S.A., AV. CHACALTAYA NO. 774, LA PAZ, BOLIVIA; (C) COMPANIA MOLINERA BOLIVIANA, AV. VASQUEZ 843, LA PAZ, BOLIVIA; AND (D) FABRICA LA ESTRELLA S.R.L., KM. 7 CARRETERA A ORURO, EL ALTO, LA PAZ, BOLIVA.**

M/V COMET                          Charter Part, Dated November 9, 2005
Food For Progress Program                      Wheat in Bulk to Bolivia

3.  **THROUGH BILL OF LADING** Rate of freight: <u>ONE HUNDRED AND THIRTY-NINE DOLLARS</u>
<u>AND TWENTY-FIVE CENTS ($139.25), U.S. CURRENCY, PER TON OF 2,204.6 POUNDS ON BILL OF</u>
<u>LADING QUANTITY; ADDL USD 15.00 PMT ON ENTIRE CARGO FOR EACH ADDL LOAD BERTH IF USED;</u>
<u>ADDL USD 20.00 PMT ON ENTIRE CARGO FOR EACH ADDL LOAD PORT IF USED.</u>

<u>THROUGH BILL OF LADING FREIGHT RATE BREAKDOWN: OCEAN FREIGHT RATE (INCLUDING</u>
<u>BULK DISCHARGE): $ 110.75 PMT BASIS ONE (1) LOAD PORT TO ONE (1) DISCHARGE PORT; RATE</u>
<u>FOR INLAND TRANSPORTATION TO FINAL DESTINATION POINT(S): $ 28.50 PMT</u>

4.  Freight Payable To: <u>**MING JADE INVESTMENTS S.A. CURACAO**</u>

One-Way <u>**OCEAN**</u> Rate:

Cost of Lightening: <u>**NOT APPLICABLE**</u>

5.  Owners to give Charterers or their Agents, in writing, fourteen (14) days'
preadvice of vessel's expected readiness to load and quantity of cargo required.
Preadvice notice must be received at the office of International Services Corp.,
Wash., D.C. prior to 11:00 A.M. Wash., D.C. time on regular business day to be
considered received on that day.  If preadvice is received later than 11:00 A.M.
Wash., D.C. time on regular business day or on weekends / holidays, preadvice notice
will be considered received only on next business day. In addition to sending
preadvice notice to Charterer's agent as above, Owner must provide at the same time a
copy of their preadvice notice to USDA KC, CFSA, Export Operations Division, Fax
No. (816) 823-2586.

In order to provide timely status reports to Receiver, Charterer requires
that Owner provide accurate daily vessel position / status reports with vessel's
position / activity / relevant ETAs at load and discharge port(s) commencing when
vessel provides its preadvice notice of vessel's ETA at load port and continuing
through completion of discharge.  These daily notices are to be provided to
International Services Corp. by fax (202) 296-1160 or email: mail@isc-pci.com.

6.  Notification of the Vessel's readiness to load at the first or sole loading
port must be delivered at the office of Charterers/Receivers, or their Agents, at or
before 4:00 PM on any normal business day (or at or before 12 o'clock noon, if on
Saturday, unless Saturday is a holiday), Vessel also having been entered at the
Custom House and filed with the Suppliers/Loading Facilities/Elevators, accompanied
at loading port by:

A.  In the United States port(s):

(1)   Certificate or Readiness for all cargo compartments issued by the
National Cargo Bureau, Inc.;

(2)   Certificate that all cargo compartments are free of insect infestation
and objectionable odors issued by a Grain Inspector holding a license issued
by the United States Department of Agriculture pursuant to the U.S. Grain
Standards Act, or other official body customarily issuing such Certificate;



M/V COMET
Food For Progress Program

Charter Party Dated November 9, 2005
Wheat in Bulk to Bolivia

Standards Act, or other official body customarily issuing such Certificate;

B.  In Canadian port(s):

(1) Certificate of Readiness for all cargo compartments issued by the Port Warden;

(2) Certificate that all cargo compartments are free of insect infestation, and or objectionable odors issued by a Grain Inspector employed by the Department of Agriculture, Canada, or other official body customarily issuing such Certificate (and/or U.S. Grain Inspector if loading U.S. grain in Canadian port); and also confirmation, in Captain's Notice of Readiness that Vessel's Gear Certificate as required by U.S. Department of Labor, or any similar authority, where applicable, is in order.

If Owners fail to tender vessel, or substitute approved by Charterers, and same is not accepted within the laydays, whether or not the option to cancel the charter party is exercised, the Owners are to be fully responsible for all charges attributable to the failure to tender and be accepted before the canceling date of the charter, whether accruing to Charterer or to the United States Government as donor, including but not limited to the grain carrying charges covering interest, storage, insurance and fumigation, and excess freight or reprocurement costs.  In which case it will be a condition of payment of freight that Owners submit as part of their documentation "PAID" invoices from the suppliers for carrying charges or a certification from such suppliers that carrying charges did not accrue.

7.  Time for loading, if required by Charterers, not to commence before 8:00 a.m. on **NOVEMBER 21, 2005**.  Should the Notice of Readiness at loading port not be delivered as per Clause 6 by 12 o'clock noon on **NOVEMBER 30, 2005**, the Charterers, or their Agents, shall at said hour and at any time thereafter, but not later than the presentation of Notice of Readiness together with the required Certificates at said office, have the option of canceling this Charter Party.

8.  Captain to call at Charterers' or their Agents' office as requested, and sign Bills of Lading as presented in the form customary for grain cargoes, without prejudice to this Charter Party.  If Bills of Lading are not ready for signature, the Captain is to deliver to Charterers, or their Agents at loading port(s), a signed copy of his written authority to his Agents at loading port(s) to sign Bills of Lading on his behalf.

9.  Owners, or their Agents, shall release three (3) Originals and three (3) Non-negotiable copies of clean, on-board Ocean Bill(s) of Lading to the Shipper or their agent promptly upon completion of loading of each Commodity Supplier's cargo.

10.  Cost of cargo separations, if any, to be for Owners' account.

11.  Cargo to be loaded according to berth terms with customary despatch at the average rate of **4,000** tons of 2,204.6 pounds per weather working day of 24 consecutive hours, **SATURDAYS**, Sundays and holidays excepted, even if used.  The load guarantee does not apply on Lash/Seabee barges but they are to be loaded in regular turn without undue delay.

~~Notwithstanding any custom of the port to the contrary, Saturdays shall not count as laytime at the loading port or ports where stevedoring labor and/or grain handling facilities are unavailable on Saturdays or available only at overtime and/or premium rates.  In ports where only part of Saturday is affected by such conditions, as described above, laytime shall count until the expiration of the last straight time period.  Where six (6) or more hours of work are performed at normal rates, Saturday shall count as a full layday.~~

M/V COMET   Case 1:05-cv-02443-HHK    Document 4    Filed 01/17/2006    Page 28 of 37 9, 2005
Food For Progress Program      Charter Part, ated November 9, 2005
                     Wheat in Bulk to Bolivia

If trimming of Vessel is required by the National Cargo Bureau, any and all trimming expenses, including but not limited to trimming machine hire and elevator overtime, are for Owners' account. Any securing (bagging or strapping, etc.) required by Master, National Cargo Bureau or Port Warden for safe trim / stowage to be supplied by and paid for by Owners and time so used not to count as laytime or time on demurrage. All necessary mats, vents and dunnage to be supplied by and paid for by Owners.

12. Laytime is non-reversible.

Laytime accounts are to be settled directly between Owners and Commodity Supplier(s) at load port(s). Laytime calculation, overtime, and trimming are to be in accordance to Addendum No. 1 of the North American Export Grain Association, Inc. F.O.B. Contract No. 2 (revised as of August 1, 1988), clauses nos. 1-10 inclusive, (hereinafter "N.A.E.G.A."), regardless of type of vessel. Further, the following modifications to N.A.E.G.A. will apply: anywhere the word "buyer" appears, the words "vessel owner" should be substituted in its place.

Under no circumstances shall Charterers or USDA/CCC be responsible for resolving disputes involving the calculation of laytime or the payment of demurrage or despatch between the Vessel Owners and the Commodity Supplier(s).

Any/all disputes between the Vessel Owner and the Commodity Supplier(s), arising out of this contract relating to the settlement of laytime issues shall be arbitrated in New York subject to the rules of the Society of Maritime Arbitrators, Inc.

13. At loading, Vessel's equipment shall comply with regulations established by U.S. Public Law 85-742, Part 9 (Safety and Health Regulations for Longshoring). If longshoring are not permitted to work due to failure of the Captain and/or Owners Agents to comply with the aforementioned regulations, any delay resulting therefrom shall be for the Owners's account.

14. Freight Payment:

A. If there is any failure on the part of the ocean carrier to perform the contract after the vessel tendered at the loading port, the Charterers or its designated agent shall be entitled to incur all expenses which, in the judgment of the United States Department of Agriculture (Administrator FAS)/Charterer (Secretaria Ejecutiva PL-480), are required to enable the vessel to undertake and carry out her obligations under the Charter Party, including the expenses for lifting any liens asserted against the vessel. Such expenses may be deducted from the freight earned under the Charter Party notwithstanding any prior assignments of freight made by the Owners or operators.

B. Notice of Arrival Required

(1) Payment of sixty percent (60%) of freight will be made in accordance with terms of the Charter Party upon satisfactory notice from the Government of Bolivia (Secretaria Ejecutiva PL-480) of the vessel's arrival at first port of discharge. This notice will be a part of documentation required to be presented by the carrier as a condition to payment.

(2) A notice of arrival will not be required in the event the vessel is lost or unable to proceed to destination after completion of loading because of damage caused by the perils of the sea or other waters, collision, stranding, jettison, wreck, fire from any cause, Act of God, public enemies or pirates, or by arrest or restraint of Princes, rulers or peoples without the fault of the suppliers of the ocean

M/V COMET
Case 1:05-cv-02443-HHK   Document 4   Filed 01/17/2006   Page 29 of 37
Charter Part Dated November 9, 2005
Food For Progress Program
Wheat in Bulk to Bolivia

transportation, wars, public disorders, captures or detentions by public authorities in the interest of public safety, provided the vessel Owners or Operators supply evidence satisfactory to the Charterers of such disability.

(3)  The notice of arrival must be furnished promptly by the Government of Bolivia (Secretaria Ejecutiva PL-480) or its designated agent and must include name of vessel, name of first port of discharge and date of arrival.

C.  CCC is required to issue all payments by electronic transfer. Each ocean carrier or cooperating sponsor submitting documents to CCC for payment must provide, on their letterhead and signed by an official or agent of their company, the name of the company, the bank ABA number to which payment is to be made, the account number for the company at the bank, the company's taxpayer identification number and the type of account being used.

D.  Documentation required for sixty percent (60%) payment or reimbursement by CCC.

(1)  One signed copy of completed form CCC-512;

(2)  Four copies of original "on board" bills of lading, indicating freight rate and signed by originating carrier;

(3)  For all non-containerized grain cargoes:

One signed copy of a "Federal Grain Inspection Service (FGIS) Official Stowage Examination Certificate" (vessel hold certificate); and

One signed copy of a National Cargo Bureau Certificate of Readiness (vessel hold inspection certificate); and

One signed copy of a National Cargo Bureau Certificate of Loading.

(4)  ~~For all containerized grain and grain products, one signed copy of an FGIS container condition inspection certificate.~~

(5)  One signed copy of Booking Note and/or Charter Party and Addenda, if any, thereto covering ocean transportation of cargo;

(6)  For charter movements, a signed notice of arrival at first discharge port, to be submitted by the Cooperating Sponsor;

(7)  Four copies of either:
   (a) A request by the Cooperating Sponsor for reimbursement of ocean freight or ocean freight differential, indicating amount due, accompanied by a certification from the ocean carrier that payment has been received from the Cooperating Sponsor; or
   (b) A request for direct payment of ocean freight to the ocean carrier, indicating amount due; or
   (c) A request for direct payment of ocean freight differential to the ocean carrier, accompanied by a certification from the carrier that payment of the cooperating sponsor's portion of the ocean freight has been received.

(8)  ~~For all liner cargoes, a copy of the tariff page.~~

(9)  One copy of Agent's / Broker's commission(s) and outport agency fee invoice(s) marked "Paid".

(10)   One copy of NCB certification as per clause **43** of the Charter Party.

E.   Documentation Required for forty percent (40%) payment or reimbursement by CCC.

(1) Confirmation Letter, issued by Charterer, stating that Owners have delivered all of the cargo under through bill(s) of lading to the point(s) of initial discharge in **LA PAZ**, Bolivia and have fulfilled their responsibilities under the Charter Party.

(2) One signed copy of completed Form CCC-512.

15. Section 408 of the Coast Guard Authorization Act of 1998, Public Law 105-383 (46 U.S.C., Paragraph 2302(e)), establishes effective January 1, 1999, with respect to non-U.S. flag vessels and operators / owners, that substandard vessels and vessels operated by operators / owners of substandard vessels are prohibited from the carriage of government impelled (preference) cargo(es) for up to one year after such substandard determination has been published electronically.

The cargo covered by this Charter Party is a government impelled (preference) cargo. Owner has warranted that the vessel(s) and the Owners / Operators are not disqualified to carry such government impelled (preference) cargo(es). Owner shall indemnify Charterer/USDA for any and all consequences including but not limited to fines and/or penalties and/or legal defense and/or carrying charges should either vessel(s) and/or owners / operators covered under this Charter Party be or become disqualified for carriage of such government impelled (preference) cargoes regardless of Charterer's/USDA's approval of the freight fixture covered by this Charter Party.

16.   Owner to appoint and pay their Agents and stevedores at loading port. For each loading port, a fee of $1,500.00 covering outport agency services to be paid by the Owners to International Services Corp., Washington, D.C. who will appoint and pay Charterers' agents.

17.   Sailing notice, indicating Vessel's name, port of loading, commodity, quantity loaded in metric tons, time of sailing, and Estimated Time of Arrival at discharging port, should be sent to:

A.   INTERNATIONAL SERVICES CORPORATION       Telephone: (202) 785-3400
     1629 K Street, N.W.                       Telefax:   (202) 296-1160
     Suite 700                                Email: mail@isc-pci.com
     Washington, D.C.   20006

B.   SECRETARIA EJECUTIVA P.L.-480          Telephone: (591-2) 390075
     Edificio HANSA                         Telefax:     (591-2) 390809
     Avenida Mariscal Santa Cruz - Piso 20
     La Paz, BOLIVIA

The Owners are to forward immediately upon availability to Owners, and in triplicate (3), to Charterers' Agent INTERNATIONAL SERVICES CORPORATION, Washington, D.C.:

A.   Stowage Plan or copies thereof;
B.   Vessel's Hold Inspection Certificate or copies thereof;
C.   NCB Certificate of Readiness or copies thereof.

18.   Owners are responsible for Vessel arriving at load/discharge (transit) port(s) with an acceptable safe arrival draft. If Vessel's draft exceeds such draft, Owners to be fully responsible for any and all costs in reaching safe draft.

M/V COMET Case 1:05-cv-02443-HHK   Document 4   Filed 01/17/2006   Page 31 of 37
Food For Progress Program                                    Charter Part   Dated November 9, 2005
                                                             Wheat in Bulk to Bolivia

Lightening, if required, to be accomplished in the territorial waters of the country where cargo is to be discharged.

If Vessel was contracted basis full or partial lightening, and if lightening is not performed at the discharge port and vessel discharges directly at berth, USDA will deduct the lightening cost from the ocean freight payment.

Daughter vessels must be bulk carriers.

19.  Discharging Terms: The cargo is to be discharged by Owner at the discharge (transit) port(s) under berth terms with no demurrage / no despatch / no detention. Owner/Inland Transportation Contractor is to deliver cargo in bulk under through bill(s) of lading to point(s) of initial discharge in La Paz, Bolivia as specified above in this Charter Party at owner's time, risk and expense.

Name of Inland Transportation Contractor:
**PORTSERV LTD. CANADA**

Mode of Inland Transport: **TRUCK**

Routing/Transit Time: **7-10 DAYS**

72/48 and 24 hours notice of the arrival of the cargo shall be provided by the inland transportation contractor to the receivers.

20.  (a) Demurrage:

Commodity Supplier(s) at each load port to pay demurrage separately to Owners, if incurred, at the rate of **$13,000**,  U.S. currency, per day or pro-rata for part of a day for all laytime lost in loading.

(b) Despatch:

Owners to pay despatch separately to Commodity Supplier(s) at each load port, if earned at such port(s), at the rate of **$6,500**,  U.S. currency, per day or pro-rata for part of a day for all laytime saved in loading.

21.  Vessels must be able to be fumigated with an aluminum phosphide preparation in-transit in accordance with the USDA, FGIS Fumigation Handbook and vessels that cannot be so fumigated will not be considered.  At final loading port, commodity supplier will arrange and pay for in-transit fumigation performed by a certified applicator in accordance with the USDA, FGIS Fumigation Handbook. fumigation must be witnessed by FGIS, USDA, and the aluminum phosphide preparation must be contained in packaging as described in the Fumigation Handbook.  Dust retainers must be used.  For tweendeckers and bulk carriers (including push-mode ITB), the recirculation method of fumigation will be used.  For tankers and tug/barges, other than push-mode ITBs, the surface method of fumigation will be used.

Tween-deck vessels will be considered provided they are acceptable for in-transit fumigation in accordance with FGIS Fumigation Handbook.  Owners of Tween-deck vessels must have provided a copy of a letter from FGIS, USDA stating that the vessel can be fumigated under the FGIS in-transit fumigation procedures.

In addition, tween-deck vessels are acceptable only when a certified applicator has stated that the vessel has been inspected and found to be suitable for fumigation and such written statement from certified applicator has been submitted to Charterer/USDA.

At the discharge port and upon inspection by government inspectors, if cargo

M/V COMET                    Case 1:05-cv-02443-HHK    Document 4    Filed 01/17/2006    Page 32 of 37
Food For Progress Program                              Charter Party   Dated November 9, 2005
                                                                       Wheat in Bulk to Bolivia

and/or vessel is found to be infested and provided clean Bill(s) of Lading were issued, fumigation costs if any are for owner's (vessel's) account.

23.  At discharge (transit) port(s), Owners to appoint and pay vessel's agent and stevedores.

24.  Overtime at loading port(s) is for the account of party ordering same. Overtime at discharging ports is for account of Owners.  Overtime for officers and crew at loading or discharging port(s) shall be for Owners' account.

25.  Vessel Gear Requirements: Vessel Owners must provide at their time, risk and expense all necessary discharging gear, whether on board vessel or on shore, to effect the discharge of the cargo in accordance with the regulations of the Port Authority of the discharge (transit) port(s) designated by Owner.  Mechanical or hydraulic hatch covers for vessels or rain tents for all hatches are required.

26.  Berthing: Charterers' option of **TWO (2)** safe berths, each port, in loading and shifting expenses and all other expenses to be for Owners' account. All shifting expenses and all other expenses at discharging (transit) port(s) to be for Owner's account.

27.  Charterers and/or their Agents have the right to be on board the Vessel while loading/discharging, for the purpose of supervising their interests.

28.  Any additional completion cargo(es) must be duly separated, must be compatible and non-injurious to Bolivia's wheat cargo(es), and must be approved by Charterers / USDA.  Vessel's itinerary and geographic proximity of completion cargo(es) will be taken into consideration by Charterers / USDA in approval of such part cargo(es) in order not to unduly impede delivery of Bolivia's cargo to discharge port(s).

29.  At loading and discharging ports all dues and/or wharfage and/or taxes on Vessel including light dues, to be for Owners' account and any dues and/or taxes on cargo and/or freight are to be for Charterers' account.  Service and facilities, if any, are for Owner's account.

Notwithstanding the above, any dues and/or taxes at discharge port(s) which are customarily for the Vessel's account under Berth terms contracts are to remain for Owner's account.

30.  Foreign flag vessels should not be older than twenty (20) years and must be classed highest in Lloyd's Register or its equivalent.  Date of original construction, not rebuilt date, to govern.

Any extra insurance on account of vessel's age shall be for Owner's account but not exceeding New York market rates.  Any extra insurance on account of vessel's flag, ownership, type (including tug/barge), configuration, or classification will be for Owner's account but not exceeding New York market rates.

31.  The following Clauses as attached are to be considered as fully incorporated in this Charter Party:  Amended Centrocon Strike Clause; War Risk Clauses 1 & 2; Both-to-Blame Collision Clause; New Jason Clause; Protection and Indemnity Bunkering Clause; U.S.A. Clause Paramount.

32.  Should General Average conditions arise, Charterer (Government of Bolivia - Secretaria Ejecutiva PL-480) shall assign its rights to the USDA/DEBT management section, who in turn shall contribute with the Owner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be incurred including salvage and special charges incurred in respect to the goods.  If



M/V COMET                                    Charter Party, Dated November 9, 2005
Food For Progress Program                               Wheat in Bulk to Bolivia

as if the said salving ship or ships belonged to strangers.  General Average shall be
payable according to York/Antwerp Rules, 1974.  Cargo to be released without general
average security.

33.   Transshipment is prohibited.

34.   Penalty for non-performance of this Agreement is limited to proven damages,
not exceeding the estimated amount of freight.

35.   Vessel to have privilege of fueling en route.

36.   ~~In case of dispute between Owners and Charterers, and in case no amicable
agreement is reached, Bolivian Law is to apply, but not to the exclusion of Food for
Progress rules.~~

37.   In case of dispute as to any rights or obligations of CCC, as
successor/assignee or otherwise, which cannot be settled by agreement, such dispute
shall, in the discretion of CCC, not be subject to arbitration but shall be decided
by the U.S. Courts.

38.   Vessel to have a lien on the cargo for all freight and deadfreight.
Charterers' liability under this Charter to cease on cargo being shipped except for
payment of freight and deadfreight.  The said Charterers, or their Agents, are to
have the privilege of transferring this Charter to others (guaranteeing to the
shipowner the due fulfillment of this Charter).

39.   ~~In addition to the NCB inspection certificate and the vessel hold inspection
certificate issued by the agencies licensed by USDA/AMS, all tankers and oil-bulk-ore
vessels must supply all documents required under terms of loading elevators'
tariff(s) and must agree to abide by all rules, regulations, terms encompassed by
loading elevators' tariff(s).~~

40.   Vessel description:

    **VESSEL:  COMET, COMET FLAG BULK CARRIER BARGE, BUILT 1997,**
    **10,095 ST DWT ON 8.0 M, LOA 133.33 M, BEAM 19.4 M,**
    **3 HOLDS / 3 HATCHES, GRT 5,997, CU M GRAIN 12,175,**
    **SPEED ABT 13 KTS**

    **VESSEL'S ITINERARY: ETA U.S. GULF NOVEMBER 21-22, 2005; ETA MATARANI,**
    **PERU, 14 DAYS AFTER SAILING LAST LOAD PORT; ETA LA PAZ (FIRST CONVOY)**
    **ABOUT 7-10 DAYS AFTER ARRIVAL AT DISCHARGE PORT**

41.   This Charter Party is subject to all provisions of the Food for Progress Act
of 1985 and all applicable U.S. Department of Agriculture regulations.

42.   A commission of **2/3RDS** OF 2.5 percent on gross freight and deadfreight
is payable on signing this Charter Party by Owners to: INTERNATIONAL SERVICES CORP.,
Washington, D.C. **AND 1/3 OF 2.5% EURO-AMERICA SHIPPING & TRADE, INC.**

43.   Vessels 15 years and older and tug/barge combinations must have
all openings to cargo spaces and hatches' covers tightly sealed with tape or by other
means to assure water tight integrity.  The sealing shall be done to the satisfaction
of attending NCB surveyor as attested by a special survey.  Cost of sealing hatch
covers/openings to cargo spaces as well as special survey fees shall be for vessel
Owner's account.  Special survey certificate shall in no way diminish Owner's
liability and responsibilities toward the cargo.

M/V COMET  Case 1:05-cv-02443-HHK    Document 4    Filed 01/17/2006    Page 34 of 37 9, 2005
Food For Progress Program                                    Charter Part  Dated November
                                                            Wheat in Bulk to Bolivia

44. ~~U.S. flag tankers must fully lighten into daughter vessel(s) at discharge (transit) port(s) at owner's time, risk and expense. Daughter vessel(s) must be bulk carriers. Non-U.S. flag tankers are excluded.~~

45. Owners guarantee that this vessel complies fully with the International Safety Management (ISM) Code, if required, and is in possession of a valid Document of Compliance and Safety Management Certificate and will remain so for the entirety of her employment under this Charter Party. Owners are to provide Charterers with satisfactory evidence of compliance if required to do so and to remain fully responsible for any and all consequences resulting directly or indirectly from any matters arising in connection with this vessel and the ISM Code.

46. The Mississippi River District including, but not north of, Port Allen is to be considered as one port. The Columbia River District including Portland is to be considered as one port. The San Francisco Bay Area including Sacramento and Stockton is to be considered as one port.

47. Substitution of Vessel not permitted without Charterers' / USDA's prior written approval. Any Vessel substituted shall be of the same type, class, approximate size and with same laydays.

48. In the event of any conflict between the provisions of the Charter Party and Bills of Lading issued pursuant thereto, Charter Party terms shall govern.

49. U.S. Flag approved freight rates will be reduced to a level not higher than the Maritime Administration fair and reasonable rate in the event that originally approved vessel is substituted by a lower cost vessel to the U.S. Government.
For U.S. flag vessels loading less than a full cargo, the less than full cargo freight rate will be subject to a reduction to meet any revised Maritime Administration freight rate guideline due to vessel loading other additional cargo.

50. The United States Department of Agriculture Kansas City Commodity Office will pursue recovery of any cargo loss and/or cargo damage claim arising from this voyage.

51. The United States Department of Agriculture Kansas City Commodity Office's Guidelines for "Claims for over, short and damaged cargo documentation" is incorporated into this Charter Party.

52. In case of claims for loss, damage, or shrinkage in transit, or any other claims against the carrier, the rules and conditions governing commercial shipments and the provisions of the Carriage of Goods by Sea Act of 1936 shall not apply as to period within which notice thereof shall be given to carriers or to period within which claim therefore shall be made or suit instituted.

53. Charterers or their agents to have the privilege of transferring this Charter to others (guaranteeing to Owners the due fulfillment of this Charter).

**54. ISPS CODE REQUIREMENT:**
**(A)  (I)  FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) IN RELATION TO THE VESSEL, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY" (AS DEFINED BY THE ISPS CODE) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE RELATING TO THE VESSEL AND "THE COMPANY". UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS. THE OWNERS SHALL PROVIDE THE CHARTERERS WITH THE FULL STYLE**

M/V COMET                                      Charter Party Dated November 9, 2005
Food For Progress Program                              Wheat in Bulk to Bolivia

CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).
    (II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE,
EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF
THE OWNERS OR "THE COMPANY" TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR
THIS CLAUSE SHALL BE FOR THE OWNERS' ACCOUNT.
  (B) OWNER TO SPECIFY ANY INFORMATION REQUIRED FROM CHARTERERS IN ORDER TO
COMPLY WITH ISPS AT TIME VESSEL TENDERS PRE-ADVICE NOTICE FOR THIS CARGO.    THE
CHARTERERS SHALL PROVIDE THE CSO AND THE SHIP SECURITY OFFICER (SSO)/MASTER WITH
THEIR FULL STYLE CONTACT DETAILS AND ANY OTHER INFORMATION THE OWNERS REQUIRE TO
COMPLY WITH THE ISPS CODE.


CHARTERERS:                              OWNERS:
GOVERNMENT OF BOLIVIA

By: International Services Corp.
(as agents only)

                                         CONCHIA CHARTERING COMPANY
                                              OF COLORADO, INC.

By:
Mariano Echevarria
President

M/V COMET                                    Charter Part  Dated November 9, 2005
Food For Progress Program                                 Wheat in Bulk to Bolivia


AMENDED CENTROCON STRIKE CLAUSE:

If the cargo cannot be loaded by reason of Riots, Civil Commotions or of a Strike
or Lock-out of any class of workmen essential to the loading of the cargo or by
reason of obstructions or stoppages beyond the control of the Charterers caused by
Riots, Civil Commotions or a Strike or Lock-out on the railways, or in the docks or
other loading places or if the cargo cannot be discharged by reason of Riots, Civil
Commotions or of a Strike or Lock-out of any class of workmen essential to the
discharge, the time for loading or discharging, as the case may be, shall not count
during the continuance of such causes, provided that a Strike or Lock-out of the
Shippers and/or Receivers men shall not prevent demurrage accruing if by the use of
reasonable diligence they could have obtained other suitable labour at rates current
before the Strike or Lock-out.  In case of any delay by reason of the before
mentioned causes, no claim for damages or demurrage shall be made by the Charterers /
Receivers of the cargo or Owners of the steamer.  For the purpose, however, of
settling despatch rebate accounts any time lost by the steamer through any of the
above causes shall be counted as time used in loading or discharging, as the case may
be.


CHAMBER OF SHIPPING WAR RISK CLAUSES:

1.  No Bills of Lading to be signed for any blockaded port and if the ports of
discharge be declared blockaded after Bills of Lading have been signed, or if the
port to which the ship has been ordered to discharge either on signing Bills of
Lading or thereafter be one to which the ship is or shall be prohibited from going by
the Government of the Nation under whose flag the ship sails or by any other
Government, the owner shall discharge the cargo at any other port covered by this
Charter Party as ordered by the Charterers (provided such other port is not a
blockaded or prohibited port as above mentioned) and shall be entitled to a freight
as if the ship has discharged at the port or ports of discharge to which she was
originally ordered.

2.  The ship shall have liberty to comply with any orders or directions as to
departure, arrival, routes, ports of call, stoppages, destination, delivery or
otherwise howsoever given by the Government of the Nation under whose flag the vessel
sails or any department thereof, or by any person acting or purporting to act with
the authority of such Government or of any department thereof, or by any committee or
person having, under the terms of the War Risks insurance on the ship, the right to
give such orders or directions and if by reason of and in compliance with any such
orders or directions anything is done or is not done, the same shall not be deemed a
deviation, and delivery in accordance with such orders or directions shall be a
fulfillment of the contract voyage and the freight shall be payable accordingly.


BOTH-TO-BLAME COLLISION CLAUSE:

If the liability for any collision in which the vessel is involved while
performing this Bill of Lading fails to be determined in accordance with the laws of
the United States of America, the following clause shall apply:

If the ship comes into collision with another ship as a result of the
negligence of the other ship and any act, neglect or default of the master,
mariner, pilot or the servants of the Carrier in the navigation or in the
management of the ship, the owners of the goods carried hereunder will

indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## NEW JASON CLAUSE:

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

## PROTECTION & INDEMNITY (P & I) BUNKERING CLAUSE:

The vessel, in addition to all other liberties, shall have liberty, as part of the contract voyage and at any stage thereof, to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter, and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

## U.S.A. CLAUSE PARAMOUNT:

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or Immunities or an increase of any of its responsibilities or liabilities under said Act.  If any term of this bill of lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

