UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

EGON OLDENDORFF (LIBERIA) INC.,

                Plaintiff,                CIVIL NO.: 05-2443-HHK

                -against-

MING JADE INVESTMENTS, S. A.,

                Defendant.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO UNITED STATES' MOTION TO SET ASIDE
<u>ORDER OF MARITIME ATTACHMENT AND GARNISHMENT</u>**

<u>**STATEMENT OF THE CASE**</u>

This is an action by the owner of the cargo vessel M.V. THEODOR OLDENDORFF against its charterer to recover an unpaid balance of freight and demurrage. (Demurrage is the contractual daily charge for delays in port.) The defendant charterer, Ming Jade Investments S. A. ("Ming Jade"), is a ship operator which does not own any ships or cargoes. Ming Jade uses ships chartered from ship owners to carry other parties' cargoes, and makes its money on the difference between what it pays the ship owner and what it earns from the cargo owner.

When this action was filed on December 21, 2005, the vessel was stuck at Lagos, Nigeria, and the claim was calculated to be $596,903.89 plus $100,000 for interest, costs, and attorney's fees. The merits of the claim are subject to arbitration in New York, in which costs and attorney's fees are recoverable.[1] The ship remained in Lagos until January 16, 2006, and the amount owed Plaintiff is now $727,383.05, plus interest, costs, and attorney's fees. (Greenbaum

---

[1] The Federal Arbitration Act reserves a claimant's traditional remedy of maritime attachment in matters that are otherwise subject to arbitration. 9 U.S.C. § 8.

Decl. Ex. 4)

On December 21, 2005, this Court issued its Order for Process of Maritime Attachment and Garnishment of funds or credits owed to Defendant by the Commodity Credit Corporation ("CCC"), pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). This memorandum and the accompanying Declaration of Jack A. Greenbaum are submitted on Plaintiff's behalf in opposition to the United States' motion to vacate that maritime attachment order.

According to the exhibits annexed to the Declaration of Peter F. Frost accompanying the United States' motion, a charter party dated November 9, 2005 was entered into between Defendant, "Ming Jade Investments S.A. Curacao," as the operator of the M/V COMET, and Asociacion de Industriales Molineros, La Paz, Bolivia, as charterer. (Frost Ex. B) The freight was and is payable by CCC. (Frost Ex. A at ¶ IB)

Pursuant to an alleged charter addendum number 2 dated December 12, 2005, Ming Jade changed the payee of the COMET freight to Sonchia Chartering Co. of Colorado ("Sonchia"). (Frost Ex. B) The name of the party to the contract was not changed, only the payee. Sonchia ostensibly is the charter broker or agent for Ming Jade and signed the COMET charter addenda as such. (Id.)

The individual who signed the addenda under Sonchia's stamp, Tim Jilek, also signed a letter of indemnity in favor of Plaintiff as President of "Ming Jade Investments S. A. of Curacao." (Greenbaum Ex. 2).[2] Records of the Colorado Secretary of State show that Mr. Jilek

---

[2] Although the THEODOR OLDENDORFF charter confirmation and letter of indemnity identified Ming Jade as a Curacao company (as did the COMET charter), investigation showed there was no such company there. There was a company of that name in Panama, but it was dissolved in 1993. When it was discovered there was no such Curacao company, Ming Jade's representatives claimed that Ming Jade is a British Virgin Islands company. (Greenbaum Decl.)

is the incorporator and registered agent of Sonchia, and he and his family were Sonchia's initial directors. (Greenbaum Ex. 3). The names of current officers and directors are not publicly filed.

The ostensible change of the COMET freight payee from Ming Jade to Sonchia was a clumsy attempt by Mr. Jilek to avoid an entirely foreseeable maritime attachment for a debt of Ming Jade to Plaintiff that had already run up to hundreds of thousands of dollars at the time of the attemped diversion of the COMET freight money. Be that as it may, neither Ming Jade nor Sonchia has applied to this Court to vacate the attachment or claim the funds, and the instant motion does not argue the supposed change of payee is a ground to vacate the attachment. Therefore, that issue is not before the Court at this time.

Plaintiff opposes the United States' motion because the clear words of the statute on which the government relies bars attachment or garnishment of CCC's **own** property, not third parties' property held in CCC's hands. Plaintiff has not attached CCC's property; it has attached Ming Jade's property, namely a credit owed Ming Jade by CCC. Further, contrary to the United States' argument, the Court may not rely upon legislative history and asserted policy considerations to disregard the plain words of the statute. Moreover, any alleged policy consideration urged by the United States, if a policy exists (which is unsupported by evidence and unproven), is outweighed by the ancient and entrenched policy strongly favoring the remedy of maritime attachment.

## POINT I

### THE STATUTE AT ISSUE BARS ATTACHMENT OF CCC'S PROPERTY, NOT MING JADE'S PROPERTY

The United States' motion is based entirely on 15 U.S.C. § 714b(c), which provides CCC "may sue and be sued, but no attachment, injunction, garnishment, or other similar process,

mesne or final, shall be issued against the Corporation **or its property**."[3]

By definition, attachment and garnishment are issued against property, not against a natural or juridicial person. An injunction can be issued against a person, but this action does not seek an injunction and the prohibition of injunctions against CCC is not at issue. Rule B is entitled: "In Personam Actions: Process of Maritime **Attachment and Garnishment.**" The only in personam defendant is Ming Jade.

There is nothing ambiguous about the phrase "its property." "Its" explicitly and unambiguously refers to CCC, and "its property" clearly means the property of CCC. Further, it is a fundamental and unamibiguous tenet of law that a debt owed by "X" to "Y" is the property of "Y," not of "X." Rule B(1)(a) recognizes this truism when it explicitly refers to "the defendant's tangible or intangible property . . . in the hands of garnishees." In HBC Hamburg Bulk Carriers v. Proteinas y Oleicos, 2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. 2005), the Court rejected an argument that an electronic fund transfer in an intermediary bank was not a defendant payee's property or attachable under Rule B, and held the "only limitation . . . is that a defendant's entitlement to the credit or interest must be clear." Ming Jade's entitlement to the credit is clear.

This action attaches intangible property of Ming Jade, a debt, held in the hands of a garnishee, CCC. There has been no attempt whatsoever to interfere with CCC's bank account or any other of "its property." CCC need only sign a check in favor of the Clerk of the Court instead of Ming Jade, and be done with it. It is no more difficult for CCC to do that than it would have been to sign a check to Sonchia instead of Ming Jade.

The literal meaning of "its property" is clear. In Badaracco v. Commissioner of Internal

---

[3] Emphasis throughout this memorandum is added by us.

297087.1                                            4

Revenue, 464 U.S. 386, 104 S. Ct. 756, 78 L. Ed. 2d 549 (1984), the Supreme Court rejected an argument for "a nonliteral construction of a statute based on considerations of policy and practicality." 464 U.S. at 396. The Court wrote:

> The relevant question is not whether, as an abstract matter, the rule advocated by petitioners accords with good policy. The question we must consider is whether the policy petitioners favor is that which Congress effectuated by its enactment of [§ 714b(c)]. Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.

464 U.S. at 398.

In interpreting a statute, the first step is to determine if the language at issue has a plain and unambiguous meaning, applying the ordinary, common meaning of its words. If so, the Court's inquiry must cease. Robinson v. Shell Oil Company, 519 U.S. 337, 340, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808, 813 (1997); Chao v. Day, No. 05-5050, 2006 U.S. App. LEXIS 1654 at *4 (D.C. Cir. Jan 24, 2006); American Bar Association v. Federal Trace Commission, 430 F.3d 457, 467 (D.C. Cir. 2005); Teva Pharm. Indus. Ltd. v. Crawford, 410 F.3d 51, 53 (D.C. Cir. 2005); United States v. Barnes, 295 F.3d 1354 (D.C. Cir. 2002); Freier v. Westinghouse Electric Corp., 303 F. 3d 176, 197 (2d Cir. 2002); United States v. Dauray, 215 F. 3d 257, 260 (2d Cir. 2000); The Greenery Rehabilitation Group., Inc. v. Hammon, 150 F. 3d 226, 231 (2d Cir. 1998). If the words of the statute are clear, no interpretation is needed or permitted, and legislative history and argued policy have no role. Connecticut National Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391, 397-98 (1992); Chao v. Day, No. 05-5050, 2006 U.S. App. LEXIS 1654 at *4 (D.C. Cir. Jan 24, 2006); Teva Pharm. Indus. Ltd. v. Crawford, 410 F.3d 51, 53 (D.C. Cir. 2005); United States v. Barnes, 295 F.3d 1354 (D.C. Cir. 2002); Daniel v. United States, 428 F. 3d 408, 423-24 (2d Cir. 2004); Freier , 303 F. 3d at 197; The Greenery Rehabilitation Group, Inc., 150 F. 3d at 231.

In any event, the legislative history cited by the United States in this case **supports** Plaintiff's reading of the plain words of the statute:

> Subsection (c) provides for suability and imposes certain limitations and restrictions upon the general right to sue and be sued. It is provided that no attachment, injunction, garnishment or similar process may be issued, either prior to or after final judgment, against the Corporation or **its property**. . . The availability of any of these judicial processes would not afford to creditors or other persons **suing the Corporation** any benefit which would outweigh the possible detriment to the Government through hindrance or obstruction of the Corporation's operations, if it were made amenable to such processes.

48 U.S.C.C.A.N. at 2148.

The first underscored phrase is the same as in the statute and adds nothing to its interpretation. The second underscored phrase makes it quite clear that the processes of attachment and injunction that are barred pertain to actions by creditors **of the Corporation** who are **suing the Corporation**. The section goes on to address the forum, statute of limitations, and unavailability of juries in suits **against CCC**, making it even clearer that "its property" means what it says: CCC's property in a suit against CCC itself. Plaintiff is not suing CCC. Plaintiff is suing Ming Jade. The statute does not protect Ming Jade or its property in the hands of CCC.

Further, an attachment of CCC's debt to Ming Jade does not conflict with the statute's purpose to protect CCC's operations from hindrance or obstruction, as adverted to in the above legislative history. As previously noted, there is no hindrance because CCC need only write a check to the Court and be done with the matter. Only an attachment of CCC's own bank account or other of CCC's property would hinder its operations, and it is only such an attachment that is barred by the statute.

It is respectfully submitted the single Arkansas District Court decision cited by the United States, which in any event did not involve an attachment and garnishment under Rule B,

was wrong. In <u>Central Production Credit Associ. v. Raymond</u>, 732 F. Supp. 986 (E. D. Ark. 1990), the Court relied principally on a case holding that garnishment was not available <u>where the government had not consented to be sued</u>.  But the government **has consented** to suits against CCC, and has placed only an explicitly circumscribed limitation on such suits:  CCC's own property may not be attached.  There is no limitation on service upon CCC of judicial process in a law suit against a third party restraining the latter's property.  The Arkansas District Court did not discuss or, apparently, consider the clear literal meaning of the words of the statute, but looked mainly to an inapplicable decision in which no such statute was involved.

The Arkansas District Judge placed reliance mainly on <u>Buchanan v. Alexander</u>, 45 U.S. (4 How.) 20, 11 L. Ed. 857 (1846).  But at the time of <u>Buchanan</u>, the government had not waived immunity from suit at all, as recognized by another Supreme Court decision cited by the District Judge.  In <u>FHA v. Burr</u>, 309 U.S. 242, 60 S. Ct. 488, 84 L. Ed. 724 (1940), the Court distinguished <u>Buchanan</u> and upheld an attachment where the government had consented to be sued and did not impose any limitation on that consent. 309 U.S. at 244.  <u>FHA</u> also rejected the notion that attachments of debts the government owes third parties would impose heavy burdens on governmental instrumentalities. 309 U.S. at 249.  Therefore, that cannot be the kind of "hindrance" meant by § 714b(c)'s legislative history

The Arkansas District Judge also cited <u>United States v. Brosnan</u>, 363 U.S. 237, 80 S. Ct. 1108, 4 L. Ed. 2d 1192 (1960), for the principle that a suit against property in which the U.S. claims an interest is a suit against the U.S.  But <u>Brosnan</u> involved a government **lien**, which **is** a property interest, unlike the debt CCC owes Ming Jade.  Moreover, <u>Brosnan</u> **upheld** a State Court proceeding that extinguished the government's lien. 363 U.S. at 251-52.

The Supreme Court of Arkansas had it right in <u>Cummings v. Fingers</u>, 296 Ark. 276, 753 S.W. 2d 865 (1988). <u>Cummings</u> observed that § 714b(c) merely "provides that the Community Credit Corporation (ASCS) and **its** property are not subject to attachment proceedings, **but that law does not exempt funds from attachment that are paid to the recipient**." 296 Ark. at 278.

The Arkansas Supreme Court distinguished other federal statutes, such as the Social Security Act, which expressly exempt from attachments "moneys paid or payable" to others. In other words, if Congress wants to exempt from attachment funds the government owes to private third parties, Congress knows how to do it. It may not properly be assumed that Congress did not mean it when they protected **only** the government's own property from attachment, not third parties' property.

**POINT II**

**THERE IS AN OVERRIDING POLICY
IN SUPPORT OF MARITIME ATTACHMENT**

The government has the policy perspective backwards if it means to argue a maritime attachment of debts CCC owes to ship operators with whom it does business will somehow interfere with that business. On the contrary, CCC will find there is a dearth of ships offered to those ship operators and thus available for CCC's cargoes if the ship owners who charter to such operators are unable to get paid. Ship owners will not charter to such operators if they find they cannot exercise their traditional maritime remedies and defaulting operators are allowed to collect their freight money from CCC and disappear.

If there were a policy favoring governmental immunity from process of attachment of third parties' property (which is denied in light of the explicit words of § 714b(c)), it would be in direct conflict with the deeply rooted policy favoring maritime attachment, which should receive deference.

Maritime attachment, formerly called "foreign attachment," is available against the assets of a defendant who cannot be found in the judicial district where the assets are located. Its purpose is both to acquire jurisdiction and **ensure** satisfaction of a favorable judgment. It serves a special function and occupies a place unique to maritime law and commerce because ship owners and charterers, and their assets, frequently are "here today, gone tomorrow," literally and figuratively.

The reason for maritime attachment is perfectly illustrated by the facts of this case. First, Ming Jade was represented in the charter party and a letter of indemnity to be a Curacao company, which was subsequently discovered to be nonexistent. At one time it was a Panama company, but that company was dissolved. Currently, it is said to be a British Virgin Islands company. Ultimately, Ming Jade sought to evade payment of its debt to Plaintiff by trying to divert payment of the freights owed to it by CCC which are the subject of this action. The attempt was to divert the freights to Sonchia, whose principal is the same man who is behind Ming Jade, Mr. Jilek, who is undoubtedly the beneficial owner of both companies.

Many judicial decisions acknowledge the special purpose and place of maritime attachment in a unique industry. The rationale for the remedy was thoroughly set out in Trans-Asiatic Oil Limited, S. A. v. Apex Oil Company, 604 F. Supp. 4 (D. P.R. 1984):

> [C]onsideration must be given to the special character of admiralty proceedings and the rationale of Supplemental Rule B. Suits under admiralty and maritime jurisdiction are autonomous from common law policies and principles.

604 F. Supp. at 6.

> The process of foreign attachment, developed to meet the necessities of those engaged in the multiple aspects of maritime commerce has two purposes as established in *Swift & Co. v. Companie Colombiana*, 339 U.S. 684, 70 S. Ct. 861, 94 L. Ed. 1206 (1949): (1) to secure the appearance of the respondents and (2) to secure satisfaction in case the suit is successful.

604 F. Supp. at 7.

> Maritime attachment is part of admiralty jurisdiction in the maritime context. Since the constitutional power of the federal courts is separately derived from admiralty, suits under admiralty jurisdiction involve separate policies to a certain extent. This principle suggests, not only that jurisdiction by attachment of property **should be accorded special deference in the admiralty context**, but also that maritime actors **must reasonably expect to be sued where their property may be found**. *See Amoco Overseas Oil v. Compagnie Nationale Algerienne, supra*, 605 F. 2d [648] at 655 [2d Cir. 1979]. Thus, the history of maritime attachment itself, the autonomy of admiralty jurisprudence, the long constitutional viability of maritime attachment, and the modern trend in admiralty **to strengthen traditional admiralty remedies against property, rather than erode them**, compel the conclusion that the common law principles enunciated in *Shaffer v. Heitner, supra* [433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)] do not apply to Rule B(1) attachments. * * *

604 F. Supp. at 7.

> Property attached under Supplemental Rule B could be shipped out, otherwise disposed of, or **concealed**; **credits, such as the one involved here, could be collected or quickly transferred from the jurisdiction**. Notice prior to attachment would in many instances enable the owner to frustrate judicial enforcement of the lien. In fact, it could defeat the purposes of the attachment.

604 F. Supp. at 8.

The remedy of maritime attachment is ancient, well established, and patently necessary in so transient an industry as shipping. Manro v. Almeida, 23 U.S. (10 Wheat.) 473, 6 L. Ed. 369 (1825) As stated by the United States Supreme Court in Atkins v. Fibre Disintegrating Co., 85 U.S. (18 Wall.) 272, 203 (1873):

> The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced."

As stated by the Second Circuit in Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 85 F. 3d 44, 47 (2d Cir. 1996):

297087.1                                    10

> Maritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844.

Maritime attachment in one form or another is common in the law of maritime nations across the globe. As written by the Supreme Court in Re Louisville Underwriters, 134 U. S. 488, 493, 10 S. Ct. 587, 589, 33 L. Ed. 991 (1890):

> Courts of admiralty are established for the settlement of disputes between persons engaged in commerce and navigation, who, on the one hand, may be absent from their homes for long periods of time, and, on the other hand, often have property or credits in other places. In all nations, as observed by an early writer, such courts "have been directed to proceed at such times, and in such manner, as might best consist with the opportunities of trade, and least hinder or detain men from their employments." [Citation omitted.] In the same spirit this court has more than once said: "Courts of admiralty have been found necessary in all commercial countries, for the safety and convenience of commerce and the speedy decision of controversies, where delay would often be ruin." [Citations omitted.] **To compel suitors in admiralty (when the ship is abroad and cannot be reached by a libel in rem) to resort to the home of the defendant, and to prevent them from suing him in any district in which he might be served with a summons or his goods or credits attached, would not only often put them to great delay, inconvenience and expense, but would in many cases amount to a denial of justice.**

To compel Plaintiff to resort to the home of Ming Jade, which evidently shifts with the whim of Mr. Jilek, plainly would be a denial of justice.

## CONCLUSION

### THE MOTION TO SET ASIDE THE ORDER FOR MARITIME ATTACHMENT AND GARNISHMENT SHOULD BE DENIED

Dated:  Washington DC
        February 7, 2006

                          Respectfully submitted,

                          /s/ Mark E. Nagle
                          Leonard Fleisig (D.C. Bar No. 435944)
                          Mark E. Nagle (D.C. Bar No. 416364)
                          TROUTMAN SANDERS LLP
                          401 9th St. N.W., Suite 1000
                          Washington DC 20004
                          (202) 274-2950 (telephone)
                          (202) 654-5645 (fax)

                          *Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 7th day of February 2006, a copy of the above and foregoing Plaintiff's Memorandum in Opposition to United States' Motion to Set Aside Order of Maritime Attachment and Garnishment was filed electronically with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all parties and counsel in this case.

This 7th day of February, 2006.

/s/ Mark E. Nagle
Mark E. Nagle