UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

EGON OLDENDORFF (LIBERIA) INC.,

                Plaintiff,          CIVIL NO.: 05-2443

        -against-

MING JADE INVESTMENTS, S. A.,

                Defendant.

## DECLARATION OF JACK A. GREENBAUM

JACK A. GREENBAUM deposes and says:

1.  I am a member of the law firm of Healy & Baillie, LLP, which represents Plaintiff Egon Oldendorff (Liberia) Inc. in a New York arbitration proceeding against Defendant Ming Jade Investments, S. A. ("Ming Jade"). This Declaration and exhibits, and the accompanying Memorandum of Law, are submitted in opposition to the motion of the United States, as garnishee of a debt owed by Commodity Credit Corporation to Ming Jade, to set aside this Court's order for the issuance of Process of Maritime Attachment and Garnishment.

2.  Exhibit 1 hereto is a copy of an email from a chartering broker, Skaarup Shipbrokers, confirming agreement on the terms of a charter party between Plaintiff and "Ming Jade Investments S. A. Curaco [*sic*]," together with the Ming Jade pro forma incorporated in the confirmation message.

3.  Exhibit 2 hereto is a copy of a letter of indemnity for delivery of cargo without

297169.1

presentation of original bills of lading. The letter is signed by Tim Jilek, as President of "Ming Jade Investments S. A. Curacao."

4.    An investigation with the authorities in Curacao disclosed there is no corporation registered there named "Ming Jade Investments S. A." Further investigation revealed there was a company of that name registered in Panama, but it was dissolved in 1993.

5.  When it was discovered there was no Ming Jade in Curacao, Ming Jade and its New York attorney informed Plaintiff and Plaintiff's attorney that Ming Jade is a British Virgin Islands company.

6.    Exhibit 3 hereto consists of documents obtained from the office of the Colorado Secretary of State regarding Sonchia Chartering Company of Colorado, Inc. ("Sonchia"). These documents show that Timothy Jilek is Sonchia's incorporator and resident agent, and he and his family were the directors at the time of incorporation. The identity of current directors is not a matter of public record. Exhibit 3 also shows that Sonchia was incorporated in 1995, dissolved in 1997, and reinstated in 2004. However, its status changed to noncompliant in 2005 for failure to file an annual report.

7.  Exhibit 4 hereto is a copy of Plaintiff's final invoice to Ming Jade Investments S. A. for freight and demurrage, the Statement of Facts at Lagos, Nigeria, and Plaintiff's demurrage calculation, all reflecting a balance due of $727,383.05.

8.  Demurrage is the contractual daily charge for delay at or off port. At the time this action was filed on December 21, 2005, the ship was at Lagos, Nigeria, where she thereafter remained, accruing demurrage, until January 16, 2006. Therefore, the amount

in the complaint is less than the current invoice amount claimed in the arbitration. Additionally, interest, legal costs, and arbitrators' fees are recoverable in New York maritime arbitration. Plaintiff estimates that interest and costs will be at least $100,000.

FURTHER AFFIANT SAYETH NOT.

Executed under penalty of perjury this 6th day of February, 2006

Jack A. Greenbaum

**Lambert, LeRoy**

| | |
|---|---|
| **From:** | Oldendorff Chartering [IMCEAEX-_O=FIRST+20ORGANIZATION_OU=FIRST+ 20ADMINISTRATIVE+ 20GROUP_CN=RECIPIENTS_CN=CHARTERING21E5A7184F3B2F425F218F9459D22A2A 249266@oldendorff-northamerica.com] |
| **Sent:** | Tuesday, August 23, 2005 5:58 PM |
| **To:** | Meuser, Robert; Bulk; Marine Accounting; Oldendorff Operations New; Oldendorff Chartering New |
| **Cc:** | Jennifer Dilorenzo |
| **Subject:** | Wilhelmine O. or sub - acct. Ming Jade / Miss river to Lagos / CP date: 17Aug2005 |

Theodor Oldendorff will be the performing vessel.   Jenn will be the operator.

Brgds
AJ DiLorenzo
Oldendorff Carriers North America
Tel: +1 203 487 7302
Mobile: +1 203 252 7886
Email: aj.dilorenzo@oldendorff-northamerica.com


-----Original Message-----
From: chartering@skaarupbrokers.com [mailto:chartering@skaarupbrokers.com]
Sent: Wednesday, August 17, 2005 12:08 PM
To: chartering@skaarupbrokers.com
Subject: REF. CLEAN FIXTURE RECAP


FROM: Skaarup Shipbrokers / USA
TEL: 1 203 4877000
DATE: 8/17/2005 12:08:27 PM
REF : AD1741459


AJ + SHAWN / AKEF


PLSD TO RECAP TDYS CLEAN FIXTURE AS FOLLOWS - CP TBD 8/17/2005- PLS
CONFIRM SAME IS IN ACCORDANCE WITH YR NOTES


-ACCOUNT MING JADE INVESTMENTS S.A. CURACO

M/V WILHELMINE OLDENDORFF OR SIMILAR SUBSTITUTE
IF SUBSTITUTE THEN OWNERS TO NOMINATE NAMED VESSEL
8 DAYS PRIOR TO ETA LOADING PORT
=============
17,504 MT DWAT ON ABOUT 9.47 MTR DRAFT
BOXED SHAPE/DOUBLE SKINNED MPP SINGLEDECKER
BUILT 1998 LOA 141.35/BEAM 22.50
3 (THREE) CRANES AT 25 MTONS EACH
12.5 KNOTS ON 19.5 MT HFO NO DO AT SEA
4 HOLDS/ 4 HATCHES
GRAIN 20,704 CBM

All details about

- A FULL AND COMPLETE CARGO OF
- 12,000 METRIC TONS 10% MORE OR LESS IN OWNERS OPTION
WHEAT IN BULK STOWING ABOUT 44CFT/ MTON

1

*Ex. 1*

3,000 METRIC TONS 10% MORE OR LESS IN OWNERS OPTION
SOYABEANS IN BULK STOWING ABOUT 48 CFT /MTON

STOWAGE AS:
1- 147,306CFT    3068 METRIC TONS SOYABEANS  ( FULL)
2- 196,338CFT    4364 METRIC TONS WHEAT ( FULL)
3- 197,785CFT    4395 METRIC TONS WHEAT ( FULL)
4- 189,349CFT    4207 METRIC TONS WHEAT (FULL)

TOTAL:  WHEAT        12,966 METRIC TONS
        SOYABEANS     3,068 METRIC TONS
                     --    --
TOTAL CARGO:         16,034 METRIC TONS
- SUBJECT TO MASTER RECONFIRMATION OF STOWAGE

- LOADING 1 SAFE BERTH 1 SAFE PORT IN CHARTERERS OPTION
MISSISSIPPI RIVER NOT NORTH OF BATON ROUGE LA.

- DISCHARGE 1 SAFE BERTH LAGOS NIGERIA, WHERE CHARTERERS
GUARANTEE 9.75 METERS FW DRAFT

- LAYDAYS SEPTEMBER 1/10, 2005 ETR SEPTEMBER 2, 2005

- PRIOR TIME USED FOR LAYTIME NOT TO COUNT

- VESSEL NOT TO TENDER NOR FOR LOADING PRIOR COMMENCEMENT
OF LAYDAYS

- FREIGHT U.S.$ 40.00 PER METRIC TONS FREE IN AND OUT
SPOUT TRIMMING, ANY EXTRA TRIMMING REQUIRED ACCOUNT
VESSEL DESIGN OR REQUIRED BY NCB FOR LOADING TO BE FOR
OWNERS TIME/RISK AND EXPENSE.

- FREIGHT 95% PAYABLE WITHIN 3 BANKING DAYS AFTER SIGNING
AND RELEASING BILLS OF LADING MARKED ' FREIGHT PAYABLE AS
PER CHARTERPARTY' TO OWNERS NOMINATED BANK ACCOUNT (VIA
STALCO) DNRSANCLNL DEEMED EARNED AS LOADED ONBOARD.

- FREIGHT ALWAYS TO BE PAID BEFORE BREAKING BULK

- BALANCE OF FREIGHT TO BE SETTLED WITH DEMURRAGE/DESPATCH
WITHIN 15 DAYS AFTER OWNERS PRESENTATION OF LAYTIME STATEMENTS
WITH SUPPORTING SOF FROM AGENTS

- 5000 METRIC TONS WWD(24 CON HRS) SAT SHEX EIU LOADING

- 1500 METRIC TONS WWD(24 CON HRS) FRIDAY 1700 HR TO 0800
HR MONDAY SHEX EIU DISCHARGE

- DEMURRAGE USD 10,000 PER DAY / HALF DESPATCH LTSBENDS

- NET OF PORT CHARGES IN LAGOS NIGERIA FOR OWNERS ACCOUNT
AND TO BE PAYABLE BY CHARTERERS/RECEIVERS EXCLUDING ANY
OWNERS MATTERS WHICH TO BE HANDLED FIRECTLY BETWEEN AGENTS
AND OWNERS OF VESSEL.

- CHARTERERS NOMINATED AGENTS AT LOADING PORT , GULFHARBOR
LLC NEW ORLEANS KEN SMITH 985-661-8005 EMAIL; mail@gulfharbor.com

AND CHARTERERS NOMINATE AGENTS AT DISCHARGE PORT - TO BE
ADVISED LATER

- CHARTERERS RIGHT TO USE VESSEL'S GEAR FOR UNLOADING IN
NIGERIA , FREE OF EXPENSE TO CHARTERERS

- SHIFTING TIME AND EXPENSE FROM WAITING AREA TO BERTH
EVEN IF ON DEMURRAGE FOR OWNERS TIME/RISK AND EXPENSE.

2

- 5% TTL COMMISSION ON FREIGHT ,DEADFREIGHT, DEMMURRAGE TO STALCO FOR
DIVISION TO BE DEDUCTED FROM FREIGHT PAYMENT + 1.25% TO SKAARUP
SHIPBROKERS.

- OWNERS HAVE THE OPTION TO PUT A LIEN ON THE CARGO IF FREIGHT
HAS NOT BEEN PAID PRIOR TO VESSEL ARRIVAL AT THE DISCHARGE PORT.
OWNERS HAVE THE OPTION TO DEVIATE AND SELL THE CARGO ELSEWHERE
IN THE EVENT THAT FREIGHT HAS NOT BEEN PAID PRIOR TO VESSEL
ARRIVAL AT DISCHARGE PORT.

- ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the
International Code for the Security of Ships and of Port Facilities
and the relevant amendments to Chapter XI of SOLAS (ISPS Code)
relating to the Vessel and 'the Company' (as defined by the ISPS
Code). If trading to or from the United States or passing through

United States waters, the Owners shall also comply with the
requirements of the US Maritime Transportation Security Act 2002
(MTSA) relating to the Vessel and the 'Owner' (as defined by the
MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy
of the relevant International Ship Security Certificate (or the
Interim International Ship Security Certificate) and the full style
contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss,
damages, expense or delay) caused by failure on the part of the Owners
or the Company/Owner to comply with the requirements of the ISPS
Code/MTSA or this Clause shall be for the Owners' account, except as
otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with
their full style contact details and, upon request, any other
information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages
or expense) caused by failure on the part of the Charterers to comply
with this Clause shall be for the Charterers' account, except as
otherwise provided in this Charter Party, and any delay caused by such
failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to
comply with their obligations under the ISPS Code/MTSA, the following
shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter
Party, the Vessel shall be entitled to tender Notice of Readiness even
if not cleared due to applicable security regulations or measures

imposed by a port facility or any relevant authority under the ISPS
Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or
by any relevant authority under the ISPS Code/MTSA shall count as

laytime or time on demurrage, unless such measures result solely from
the negligence of the Owners, Master or crew or the previous trading
of the Vessel, the nationality of the crew or the identity of the

Owners' managers.

(d) Notwithstanding anything to the contrary provided in this Charter

3

Party, any costs or expenses whatsoever solely arising out of or
related to security regulations or measures required by the port
facility or any relevant authority in accordance with the ISPS
Code/MTSA including, but not limited to, security guards, launch
services, vessel escorts, security fees or taxes and inspections,

shall be for the Charterers' account, unless such costs or expenses
result solely from the negligence of the Owners, Master or crew or the
previous trading of the Vessel, the nationality of the crew or the
identity of the Owners' managers. All measures required by the Owners
to comply with the Ship Security Plan shall be for the Owners'
account.

(e) If either party makes any payment which is for the other party's
account according to this Clause, the other party shall indemnify the
paying party.

Footnote: This Clause replaces previously published ISPS Clause for
Voyage Charter Parties AND the US Security Clause for Voyage Charter
Parties, both of which are now officially withdrawn.


-OTHERWISE AS PER MV AUDRE CP DD OCT 8, 2004 WITH ATS AS PER MTERMS
AND FOLL ALTS:

- line 9: to read classed highest Lloyds 100A1 or equivalent

- Clause 4 of main body: 1st sentence after ...."not to commence
before", insert "0001 lt"

- Clause 4 of main body: 2nd sentence after ..."as per clause 17
before", insert "2359lt"

- Clause 6 of main body: after "as presented" insert add "provided
same is in strict accordance with mates receipts"

- Clause 13(a)(ii) of main body: delete "equally shared by the owners
and the charteres" and insert "for charterers account only"

- Clause 17(a) insert "NOR to be tendered whether in port or not,

whether in berth or not, whether in free pratique or not, whether

customs cleared or not."

- Clause 21 of main body: Delete clause 21.  Charterer have free use
of vessels cranes however, charterers do not have the option to use
vessels crew to drive cranes. In addition, charterers to supply
skilled and license crane drivers to operate vessels cranes.

- Clause 24 of main body: delete

- Clause 31 of main body: AS PER CP

- Clause 56(b) of rider: delete

- Clause 56(g) of rider: Delete "and ITF" from 1st sentence

- Clause 58: Delete

- Bills of Lading to read "all terms and conditions as per Charter
Party Dated: 08.17.2005

- Clause 61: Delete

- Fumigation Clause to apply as follows: Charterers are allowed the
privilege of in transit fumigation of cargo account of charterers.

4

Fumigants used only to be those which are common at all major loading ports, and those which have been approved by local loading authorities in port/s in which they will be applied.
Prior to any fumigation, Master to be notified by Charterers about the type of fumigant to be used, and to be given written instructions for their safe application. Master to notify Charterers in a timely manner of any equipment Master will require for safe administration of the fumigant.  Master's requirements for any equipment will not exceed those recommended by IMO according to BIMCO editions "Recommendations on the safe use of pesticides in ships". All costs related to the

purchase and supply of equipment to fulfill Master's requirements will be for charterers account. Master and crew to judiciously follow all instructions pertaining to fumigantsafety which may include venting of the cargo either at sea or prior to arrival at the discharge port.  If crew is required to leave the ship during the fumigation period than charterers to pay for hotel accommodations, transportation to and from as well as all other expenses related for all crew members.

- Voywar 2004 to apply and be fully incorporated into the CP

- New york arbitration ok but to read as follows below:

U.S. Law, New York Arbitration

(a)  This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and  any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of

Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.

(b)  Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been

commenced under the above, the following shall apply:-

(i)  Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the

other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii)  The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose.  The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

5

(iii)  If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv)  The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v)  Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi)  Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii)  The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.


END


THANKS TO BOTH PARTIES FOR THE COOP LEADING TO THIS CLEAN FIXTURE


BEST REGARDS,

AKEF DAJANI
SKAARUP SHIPBROKERS USA
CHARTERING@SKAARUPBROKERS.COM
WORK +1 (203)487-7000
CELL +1 (203)918-6405

**Code Name: Norgrain**

RECOMMENDED BY
NORTH AMERICAN EXPORT GRAIN ASSOCIATION
THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE
CHAMBER OF SHIPPING OF THE UNITED KINGDOM
FEDERATION OF NATIONAL ASSOCIATIONS OF SHIP BROKERS AND AGENTS

# COPY

STEWART ALEXANDER & COMPANY, INC.

7 Penn. Plaza  Suite# 1110
New York, NY 10001

# NORTH AMERICAN GRAIN CHARTERPARTY 1973

ISSUED BY THE ASSOCIATION OF SHIP BROKERS AND AGENTS (U.S.A.) INC.

TELLURIDE COLO    OCTOBER  8,  2004    19

IT IS THIS DAY MUTUALLY AGREED, between    ONEGO SHIPPING    1

**Owners**    Owners    2
*Note: Delete as*    Disponent Owners    }  of the    AUDRE    3
*appropriate*    Time-chartered Owners    S.S.    Self/Non Self Trimming Bulk Carrier    4
            Chartered Owners    M.V.    ~~Tween Decker~~    Call Sign    5
                    ~~Tanker~~    6

**Description**    Built    at    of    tons of 2,240 lbs.    7
**of Vessel.**    deadweight all told, or thereabouts, and with a grain cubic capacity available for cargo of    cubic feet (including    cubic feet in self-bleeding wing    8
        spaces)    9

**Classification.**    Classed    HIGHEST LLOYDS REGISTER    in    now    10
                        11
                        12

**Charterers**    and    MING JADE INVESTMENTS, S.A.    of    CURAÇAO    13
                            Charterers

1.—That the said vessel, being tight, staunch and strong and in every way fit for the voyage, shall with all convenient speed proceed to    14

**Loading**    ONE (1) SAFE BERTH ONE ( 1 ) SAFE PORT  TEXAS, GULF PORT , INTENTION GALVESTON TEXAS.    and there load    15
**Port(s)**    at    safe loading berth(s) in Charterers' option,    16

**Description**    always afloat,    a full and complete*    cargo in bulk of    5,200 METRIC TONS WHEAT IN BULK IN 3 GRADES  -  SEE CLAUSE 63.    17
**of Cargo.**    ~~part~~    18
                        19

        tons of    2,240 lbs.*    % more or less, quantity at Owners' option.    20
                    ~~1,000 kilos.*~~    % more or less, quantity at Owners' option.    21
    at Charterers' option.                    22

**Notice and**    2.—Owners are to give Charterers (or their Agents) (telegraphic address)    "    telex number)    23
**Loading Port**    15 and 7 days' notice of vessel's expected readiness to load date, and approximate quantity of cargo required with the 15 days' notice, such quantity to be based on    24
**Orders.**    a cargo of Heavy Grain, unless the cargo composition has been declared or indicated.    25

The Charterers are to be kept continuously advised by telegram/telex of any alteration in vessel's readiness to load date.    26

Master to apply to    GULFHARBOR LLC.    (telegraphic address    ")    27
for first or sole loading port orders 144 hours before vessel's expected readiness to load date but not sooner than 144 hours before the laydays in Clause  4  and    28
Charterers or their Agents are to give orders for first or sole loading port within 72 hours of receipt of Master's application, unless given earlier.    29

Orders for second port of loading, if used, to be given to the Master not later than

Master is to give Charterers (or their Agents) 72 and 12 hours' notice of vessel's estimated time of arrival at first or sole loading port together with vessel's estimated readiness to load date.

**Vessel Inspection.**

3.—Vessel to load under inspection of National Cargo Bureau, Inc. in U.S.A. ports ~~or of the Port Warden in Canadian ports~~. Vessel also to load under inspection of a Grain Inspector licensed/authorized by the United States Department of Agriculture pursuant to the U.S. Grain Standards Act ~~and/or of a Grain Inspector employed by the Canada Department of Agriculture, as required by the appropriate authorities~~.

~~If vessel loads at either the U.S. or Canadian ports, she is to load under inspection of such national and/or regulatory bodies as may be required.~~

Vessel is to comply with the rules of such authorities, and shall load cargo not exceeding what she can reasonably stow and carry over and above her Cabin, Tackle, Apparel, Provisions, Fuel, Furniture and Water. Cost of such inspections shall be borne by Owners.

**Laydays/Cancelling.**

4.—Laytime for loading, if required by Charterers, not to commence before 0800 on the ........... 18. th ............................ day of... OCTOBER 2004 ...........

19.......

Should the vessel's notice of readiness not be tendered and accepted as per Clause 17 before 1200 on the ............. 25 th ..........................day of......... OCTOBER 2004 ............... 19........... the Charterers or their Agents shall at any time thereafter, but not later than one hour after the notice of readiness is tendered, have the option of cancelling this Charterparty.

**Destination.**

5.—On being so loaded, the vessel shall proceed to..... ONE. (1). SAFE. BERTH. GEORGETOWN. GUYANA. ( NATIONAL. MILLING. CO). VESSEL DRAFT AT DISCHARGE PORT ON EVEN KNEEL NOT TO EXCEED 7.0 METERS FRESH WATER.

as ordered by Charterers/Receivers*, and deliver the cargo, according to Bills of Lading at........................................safe discharging berths in Charterers'

option, vessel being always afloat, on ~~being~~ paid freight as per Clauses 8 and 9.

Master to apply by radio to Charterers'/Receivers'* Agents (telegraphic address " .............................................. ") for first or sole discharging port orders 96

hours before vessel is due off/at*.

Charterers/Receivers* Agents are to give first or sole discharging port orders by wireless within 48 hours of receipt of Master's application unless given earlier. If Master's application is received on a Saturday, the time allowed to Charterers/Receivers* (or their Agents) shall be 52 hours instead of 48 hours.

~~Orders for second and/or third port(s) of discharge are to be given to the Master not later than arrival at first or subsequent port.~~

**Discharging Port Orders.**

Master to radio Charterers/Receivers* (or their Agents) 72 and 24 hours notice of vessel's estimated time of arrival at first or sole discharging port. Charterers/Receivers* (or their Agents) are to be kept continuously advised by radio/telegram/telex of any alterations in such estimated time of arrival.

**Bills of Lading.**

6.—The Master is to sign Bills of Lading as presented on the North American Grain Bill of Lading form without prejudice to the terms, conditions and exceptions of this Charterparty. If the Master elects to delegate the signing of Bills of Lading to his Agents, he shall give them such power of attorney in writing, copy of which is to be furnished to Charterers.

**Rotation of Ports.**

7.— ~~Rotation of loading ports is to be in~~ ~~Owners'*~~ ~~Charterers'*~~    option.

~~Rotation of discharging ports is to be in~~ ~~Owners'*~~ ~~Charterers'*~~    option, but if more than two (2) ports of discharge are used, rotation is to be geographic.

to..................................

**Freight.**

8.—Freight to be paid as follows:   U.S. $ 57.00 PER METRIC TON FREE IN AND OUT SPOUT TRIMMED  – SEE CLAUSE 57.

~~per ton of 2,240 lbs./1,000 Kilos*~~
~~Charterers have the option of ordering the vessel to load at........................................~~

~~in which case the rate of freight to be~~
~~per ton of 2,240 lbs./1,000 Kilos*.~~

~~Charterers/Receivers have the option of ordering the vessel to discharge at........................................~~

~~in which case the rate of freight to be~~

~~per ton of 2,240 lbs./1,000 Kilos*.~~

~~If more than one port of loading and/or discharging is used, the rate of freight shall be increased by........................................ per ton of 2,240 lbs./1,000 Kilos* for~~ each additional loading and/or discharging port on the entire cargo.

* Delete as appropriate.

COPY

**Freight Payment.**

9.—(a) ~~If vessel discharges in the United Kingdom including Northern Ireland, freight shall be payable by Charterers concurrently with discharge on out-turn weight, to Owners or their designated Agents at~~ ........................ in ........................ NEW ORLEANS, LA. ........................ currency to ........ OWNERS NOMINATED BANK ACCOUNT. SEE CLAUSE 57.

(b) For all other destinations, freight shall be fully prepaid on surrender of signed Bills of Lading in UNITED STATES ........................ on Bill of Lading weight, discountless, not returnable, vessel and/or cargo lost or not lost. Freight shall be deemed earned as cargo is loaded on board. Once the Bills of Lading have been signed, and Charterers call for surrender of Original Bills of Lading against freight payment as above, it will be incumbent upon Owners or their Agents to comply immediately with such call for surrender during office hours, Mondays to Fridays inclusive.

(c) ........................

**Cost of Loading and Discharging.**

10.—(a)* Cargo is to be loaded, stowed, trimmed (to Master's satisfaction in respect of seaworthiness) free of expense to the vessel. "SPOUT TRIMMED" Cargo is to be discharged free of expense to the vessel (to Master's satisfaction in respect of seaworthiness).

(b)* ~~Cargo is to be loaded, stowed and trimmed at Owners' expense.~~
~~Cargo is to be discharged free of expense to the vessel (to Master's satisfaction in respect of seaworthiness).~~

**Stevedores at Loading Port(s) and Discharging Port(s)**

11.—Stevedores at loading Port(s) are to be appointed by ........ Charterers* and paid by Owners.*
If stevedores are appointed by Owners, they are to be approved by Charterers at loading Port(s), and such approval is not to be unreasonably withheld. Stevedores at discharging port(s) are to be appointed and paid for by Charterers/Receivers.* In all cases, stevedores shall be deemed to be the servants of the Owners and shall work under the supervision of the Master.

**Bulk Carrier and Wing Spaces**

12.—(a) The vessel is warranted to be a ~~self-trimming bulk carrier.*~~ non self-trimming bulk carrier.*

(b) ~~Cargo may be loaded into wing spaces if the cargo can bleed into centreholds. Wing spaces are to be spout trimmed, any further trimming in wing spaces and any additional expenses in discharging are to be for Owners' account and any additional time so used is to count as laytime or time on demurrage.~~

**Overtime.**

13.—(a) Expenses
(i) All overtime expenses at loading and discharging port(s) shall be for account of the party ordering same.
(ii) If overtime is ordered by port authorities or the party controlling the loading and/or discharging terminal or facility, all overtime expenses are to be equally shared between the Owners and ~~Charterers.*~~
Charterers.*
~~Receivers.*~~

(iii) Overtime expenses for vessel's officers and crew shall always be for Owners' account.

(b) Time Counting
~~If overtime is worked during unexpected periods ordered by Owners the actual time used shall not count.~~
~~If overtime is worked during unexpected periods ordered by Charterers/Receivers* the actual time used shall not count.~~
~~If overtime is worked during unexpected periods ordered by port authorities or the party controlling the loading and/or discharging terminal or facility half the actual time used shall count.~~

~~(c) SHINC (Sunday and Holidays Included)~~
~~Section (c) shall not apply if SHINC has been agreed.~~

**Separations.**

14.—Cost of cargo separations, including labour used for laying same, to be for Charterers' account unless required by Owners, in which case all resultant expenses shall be borne by the Owners. Separations ordered by Charterers shall be made to Master's satisfaction (but not exceeding the requirements of the competent authorities).

**Securing.** *Delete para. (a) or (b) as appropriate.*

15.—(a) For Owners' account
Any securing (bagging or strapping, etc.) required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by Owners, and time to used not to count as laytime or time on demurrage. Bleeding of bags, if any, at discharge port(s) to be at Owners' expense, and time actually lost is not to count.

(b) For Charterers' account
~~Any securing (bagging or strapping, etc.) required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by Charterers, and time to used not to count as laytime or time on demurrage. Bleeding of bags, if any, at discharge port(s) to be at Charterers'/Receivers'* expense.~~

**Opening/Closing Hatches.**

16.—(a)* At each loading and discharging port, cost of first opening and last closing of hatches and removal and replacing of beams, if any, shall be for Owners' account. Cost of all other opening and closing of hatches, removal and replacing of beams shall be for Charterers'/Receivers'* account.

(b)* At each loading and discharging port, cost of all opening and closing of hatches, removal and replacing of beams, if any, shall be for Owners'* ........................ account.

0800 HOURS

**Time Counting.**

Notification of vessel's readiness to load and/or discharge ~~at the first or sole loading and/or~~ discharging port, shall be delivered in writing at the office of Charterers/ Receivers (or their Agents) between the hours of ~~0900 to 1700~~ on all days except Sundays and holidays, and between the hours of ~~0900 to 1200~~ on Saturdays. Such notice of readiness ~~shall not be required to accept notice of readiness to load or discharge on Saturdays after 1200 or on Sundays or holidays. Such notice of readiness~~ Charterers/Receivers shall not be required to accept notice of readiness to load/discharge, including Free Pratique where applicable. If the shall be delivered when vessel is in the loading or discharging berth and is in all respects ready to load/discharge within the commercial limits of loading and/or discharging berth is unavailable, Master may tender vessel's notice of readiness from a lay berth or anchorage within the commercial limits of the port subject to the provisions of Clause 17 paragraph (b).

Following receipt of notice of readiness to load or discharge as above, laytime will commence at 0800 on the next day (Sundays and holidays excepted (for Saturdays see Clause 18 (e)). If SHINC agreed, the exception of Sundays and holidays (as well as the possible exception of Saturdays under Clause 18 (e)) shall not apply.
_____ SATURDAYS
Time actually used before commencement of laytime shall count.

(b) Waiting for Berth
If the vessel is prevented from entering the commercial limits of the loading/discharging port(s) because the first or sole loading/discharging berth or a lay berth or anchorage is not available, or on the order of the Charterers/Receivers or any competent official body or authority, and the Master warrants that the vessel is physically ready in all respects to load or discharge, the time spent waiting at a usual waiting place outside the commercial limits of the port or off the port shall count against laytime. Such laytime shall count from vessel's arrival at such usual waiting place and will continue to run as per clause 18 until any of the aforesaid conditions cease to be operative and vessel is so notified by Charterers/Receivers or their Agents or any competent authority. If after entering the commercial limits of the loading port, vessel fails to pass inspections as per clause 17 (d) and requires more than four hours SHINC to pass such inspections from the time of initial failure to pass, the time spent waiting outside the commercial limits of the port as per lines 143-144 shall not count and the provisions of lines 153-154 are not to apply; but, if said vessel passes inspections within said four hours, any delay in commencing loading directly attributable to its failure to pass initial inspections shall count as laytime or time on demurrage.

Time so used is to be added to laytime (or time on demurrage) used for loading/discharging the entire cargo if Clause 18(6) and 18(c) apply and is to be added to laytime (or time on demurrage) used for loading and discharging the entire cargo if reversible laydays apply or if Clause 18(a) applies.
Once the vessel has reached a place within the commercial limits of the port, notice of readiness is to be tendered in accordance with the provision of lines 130 to 135 and laytime is to begin to count in accordance with lines 136 to 137.
At first or sole loading port the cancelling date shall be extended by the number of running days SHINC rounded to the nearest day spent waiting outside the commercial limits of the port for berth (in accordance with the provisions of lines 140 to 144).

(c) Subsequent Port(e)
~~At second or subsequent port(s) of loading and/or discharging, laytime or time on demurrage shall resume counting from vessel's arrival in loading or discharging berth if available or from vessel's arrival within the commercial limits of the port if berth is unavailable, otherwise the provisions of Clause 17 paragraph (b) shall apply.~~

(d) Inspection
At the loading port(s), Master's notice of readiness shall be accompanied by pass of the National Cargo Bureau/Port Warden and Grain Inspector's certificate of vessel's readiness in all compartments to be loaded, for the entire cargo covered by this Charterparty as per Clause 3. In the event that vessel loads in subsequent port(s) and is required to re-pass inspections in these ports, any time lost thereat in securing the required certificate shall not count as laytime or time on demurrage.

**Laytime.**

18.—(a) ~~Vessel is to be loaded and discharged within~~ ___ ~~working days of (24) consecutive hours such (weather permitting),~~ ___ 4000 METRIC TONS PER WEATHER WORKING DAYO of 24 CONSECUTIVE HOURS
~~Sundays and Holidays included (SHINC)*~~ SATURDAYS WORKING DAY OF 24 CONSECUTIVE HOURS
Holidays excepted (SHEX)*

(b) Vessel is to be loaded within ___ SATURDAYS SUNDAYS and Holidays EXCEPTED (SHINC) ___ ~~included (SHINC)~~
Holidays excepted (SHEX)* EVEN IF USED
(weather permitting), Sundays and ...

(c) Vessel is to be discharged at the average rate of ___ ~~included (SHINC)~~ tons of ___ 1000 METRIC TONS on the basis of the Bill of Lading weight.
SATURDAYS, ___ per working day of twenty-four (24) consecutive hours
(weather permitting), Sundays and Holidays excepted (SHEX)* EVEN IF USED.

(d) Laydays shall be ~~reversible~~ non-reversible*

(e) Notwithstanding anything to the contrary, Saturdays shall not count as laytime at loading and discharging port or ports where stevedoring labour and/or any part of facilities are unavailable on Saturdays or at overtime and/or premium rates.
If part of Saturdays is affected by such conditions, as described above, laytime shall count until the expiration of the last straight time period.
Where six or more hours of work are performed at normal rates, Saturday shall count as a full lay day.

(f) In the event that the vessel is waiting for loading or discharging berth, no laytime is to be deducted during such period for reasons of weather unless the vessel occupying the loading or discharging berth in question is actually prevented from working grain due to weather conditions in which case time lost is not to count.

* Delete as appropriate.

COPY

**Demurrage/ Despatch Money.**

19.—Demurrage at loading and/or discharging ports, if incurred, to be paid at the rate of ____ U.S.$ 6,000 ____ PER DAY, OR PRO RATA *per day or pro rata* for part of a day and shall be paid by Charterers in respect of loading port(s) and by Charterers/Receivers* in respect of discharging port(s). Despatch money to be paid by Owners at half the demurrage rate for all laytime saved at loading and/or discharging ports.
Any time lost for which Charterers/Receivers are responsible, which is not excepted under this Charterparty, shall count as laytime, until same has expired, thence time on demurrage.

**Shifting.**

20.—(a) Shifting expenses and time

(i) Cost of shifting between loading berths and cost of shifting between discharging berths, including bunker fuel used, to be for ____ Owners* account, time counting.

(ii) If vessel is required to shift from one loading or discharging berth to a lay berth or anchorage due to subsequent loading or discharging berth(s) not being available, all such shifting expenses, as defined above shall be for Charterers/Receivers*/ Owners* account, time counting.

(iii) Cost of shifting from lay berth or anchorage to first loading or first discharging berth to be for Owners' account.

(b) Shifting in and out of the same berth

If vessel is required by Charterers/Receivers* (or their Agents) to shift out of the loading berth or the discharging berth and back to the same berth, one berth shall be deemed to have been used, but shifting expenses from and back to the loading or discharging berth so incurred shall be for Charterers/Receivers* account and laytime or time on demurrage shall count.

**Gear and Lights.**

21.—This clause shall not apply if vessel is gearless, or chartered as such. If required, Master to give free use of vessel's cranes* ~~winches~~ and power to drive the gear, runners, ropes and slings as on board, and ____ crane drivers* ~~winchmen~~ from the crew. If shore regulations do not permit the crew to work, ~~winches~~ crane drivers* then shore ~~winchmen~~ if ~~winches~~ Owners*

used, to be for Charterers* account or Receivers/Charterers'* account at discharging port(s). Time lost on account of breakdowns of vessel's gear essential to the loading or discharging of this cargo is not to count as laytime or time on demurrage, and if this Charterparty calls for Charterers/Receivers* to pay for cost of loading or discharging any stevedore standby time charges incurred thereby shall be for Owners' account.

If required, Master shall give free use of the vessel's lighting as on board for night work.

**Seaworthy Trim.**

22.—If ordered to be loaded or discharged at two or more ports, the vessel is to be left in seaworthy trim to Master's satisfaction (not exceeding ____ 7 METRES, FRESH WATER. ____ feet) between berths at any one port and ____ feet ____ between ports, provided that the distance between such ports does not exceed ____ feet ____ for her or the first tide after arrival without lightening, and lie always afloat, and ____ 7 METRES, FRESH WATER ____ feet between the ports. If the vessel is ordered to discharge at a place in which there is not sufficient water for her to get the first tide after arrival without lightening, and lie always afloat, Charterers expense at discharging ports, and time used for placing vessel in seaworthy trim shall count as laytime or time on demurrage.
Should the vessel be ordered to discharge at a safe anchorage off or within Article 17 at a safe anchorage for similar vessels bound for such a place and any lighterage expenses incurred to enable her to get to the place of discharge is to be at the expense and risk of the cargo, any custom of the port or place to the contrary notwithstanding, but time occupied in proceeding from the anchorage to the discharging berth is not to count as laytime or time on demurrage.
Unless loading and/or discharging ports are named in this Charterparty, the responsibility of providing safe berths and/or safe ports of loading and/or discharging lies with the Charterers/Receivers* provided Owners have complied with the maximum arrival draft limitations in Lines 210 to 211.

**Draft/ Lighterage.**

23.—Owners warrant that vessel's deepest salt water draft shall not exceed ____ 7 METRES. ____ feet ____ on arrival at first or sole discharging port.

**Car Decks, etc.**

24.—It is understood that if this vessel is fitted with car decks, container fittings and/or any other special fittings not connected with the carriage of grain in bulk, any extra expenses incurred in loading and/or discharging as a result of the presence of such car decks, container fittings and/or special fittings are to be for Owners' account. Time so lost shall not count as laytime or time on demurrage.

**Dues at German Ports**

25.—~~Quay/Wharf or Tonnage dues in Germany shall be for Charterers*/Receivers* account.~~

**St. Lawrence Seaway Tolls.**

26.—~~All St. Lawrence Seaway and/or Welland Canal tolls on vessel and/or cargo assessed by Canadian and United States Authorities are to be paid and borne by Owners.~~

**Water Pollution Clause.**

27.—Owners warrant to have secured and to carry aboard the vessel a U.S. Federal Maritime Commission Certificate of Financial Responsibility as required under the U.S. Water Quality Improvement Act of 1970. In addition, Owners agree to comply with any and all Official Regulations pertaining to water pollution as applicable. Any time lost on account of vessel's non-compliance with Government and/or State and/or Provincial regulations pertaining to water pollution shall not count as laytime or time on demurrage.

**Agents.**

28.—Charterers* are to appoint agents at loading port(s) and Charterers* are to appoint agents at discharging port(s).
In all instances, agency fees shall be for Owners' account but are not to exceed customary applicable fees.

**Strikes, Stoppages, etc.**

29.—If the cargo cannot be loaded by reason of a Strike or Lock-out of any class of workmen essential to the loading of the cargo, or by reason of obstructions or stoppages beyond the control of the Charterers caused by Riots, Civil Commotions or a Strike or Lock-out on the Railways or in the Docks or other loading places, or if the cargo cannot be discharged by reason of Riots, Civil Commotions, or of a Strike or Lock-out of any class of workmen essential to the discharge, the time for loading or discharging, as the case may be, shall not count during the continuance of such causes, provided that a Strike or Lock-out of the Shippers' and/or Receivers' men shall not prevent demurrage accruing if by the use of reasonable diligence they could have obtained other suitable labour at rates current before the Strike or Lock-out. In case of any delay by reason of the before mentioned causes, no claim for damages or demurrage shall be made by the Charterers/Receivers of the cargo or Owners of the Vessel. For the purpose, however, of settling despatch rebate accounts, any time lost by the vessel through any of the above causes shall be counted as time used in loading, or discharging, as the case may be.

**Ice.**

30.—Loading Port

(a) If the Vessel cannot reach the loading port by reason of ice when she is ready to proceed from her last port, or at any time during the voyage, or on her arrival, or if frost sets in after her arrival, the Master—for fear of the Vessel being frozen in—is at liberty to leave without cargo; in such cases this Charterparty shall be null and void.

(b) If during loading, the Master, for fear of Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port with option of completing cargo for Owners' own account to any port or ports including the port of discharge. Any part cargo thus loaded under this Charterparty to be forwarded to destination at Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers/Receivers, freight being paid on quantity delivered (in proportion if lump sum), all other conditions as per Charterparty.

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for the Owners' own account or to declare the Charterparty null and void unless the Charterers agree to load full cargo at the open port.

**Voyage and Discharging Port**

(d) Should ice prevent the Vessel from reaching the port of discharge, the Charterers/Receivers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Owners or Master have given notice to the Charterers/Receivers of impossibility of reaching port of destination.

(e) If during discharging, the Master, for fear of Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest safe and accessible port. Such port to be nominated by Charterers/Receivers* as soon as possible, but not later than 24 running hours, Sundays and holidays excluded, of receipt of Owners' request for nomination of a substitute discharging port, failing which the Master will himself choose such port.

(f) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Owners shall receive the same freight as if the Vessel had discharged at the original port of destination, except that if the distance to the substitute port exceeds 100 nautical miles the freight on the cargo delivered at that port to be increased in proportion.

(g) Spring—This Ice Clause (a) to (f) not to apply in the Spring.

**Extra Insurance.**

31.—Any extra insurance on cargo incurred owing to vessel's ~~CLASSIFICATION AND/OR OWNERSHIP AND/OR FLAG AND/OR~~ ~~CONDITION AND/OR MANAGEMENT AND/OR AGE EXCEEDING 15 YEARS BUT MAXIMUM 20 YEAR OF AGE TO BE EQUALLY SHARED BETWEEN~~ OWNERS AND CHARTERERS. PREMIUM TO BE OBTAINED BY CHARTERERS FROM FIRST CLASS UNDERWRITERS.
.................. and may be deducted from the freight, in Charterers' option. The Charterers shall furnish evidence of payment supporting such deduction.

**P. & I. Bunker Clause.**

32.—The vessel shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charterparty and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

**Deviation.**

33.—Any deviation in saving or attempting to save life or property at sea or any reasonable deviation shall not be deemed to be an infringement or breach of this Charterparty and the Owners shall not be liable for any loss or damage resulting therefrom; provided, however, that if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

**Lien and Cesser Clause.**

34.—The Owners shall have a lien on the cargo for freight, deadfreight, demurrage, and average contribution due to them under this Charterparty and the Charterers' liability under this Charterparty is to cease on cargo being shipped except for payment of freight, deadfreight, and demurrage at loading, and except for all other matters provided for in this Charterparty where the Charterers' responsibility is specified.

**Exceptions.**

35.—Owners shall be bound before and at the beginning of the voyage to exercise due diligence to make the ship seaworthy and to have her properly manned, equipped and supplied and neither the vessel nor the Master or Owners shall be or shall be held liable for any loss of or damage or delay to the cargo for causes excepted by the U.S. Carriage of Goods by Sea Act, 1936 or the Canadian Water Carriage of Goods Act, 1936.

And neither the vessel, her Master or Owners, nor the Charterers or Receivers shall, unless otherwise in this Charterparty expressly provided, be responsible for loss of or damage to, or failure to supply, load, discharge or deliver the cargo arising or resulting from:—Act of God, act of war, act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process; quarantine restrictions; strikes; lockouts; riots; civil commotions; fires; blockades; riots; insurrections; Civil Commotions; earthquakes; explosion. No exception afforded the Charterers or Receivers under this clause shall relieve the Charterers or Receivers of or diminish their obligations for payment of any sums due to the Owners under provisions of this Charterparty

* Delete as appropriate.

COPY

**U.S.A. Clause Paramount.**

36.—If the vessel loads in the U.S.A. the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:
"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further."

**Canadian Clause Paramount.**

37.—If the vessel loads in Canada the Canadian Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:
"This Bill of Lading, to far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities, or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further."

**Both-to-Blame Collision Clause.**

38.—If the liability for any collision in which the vessel is involved while performing this Charterparty falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:
"If the vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or carrier.
The foregoing provisions shall also apply where the Owners, operators or those in charge of any vessel or vessels other than, or in addition to, the colliding vessels or objects are at fault in respect to a collision or contact."
The Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.    AS AMENDED 1990 AND SUBJECT

**General Average/ New Jason.**

39.—General Average shall be payable according to the York/Antwerp Rules 1974 and shall be settled in ............ SUBSEQUENT AMENDMENTS.
Where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by Statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving vessel is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."
The Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

**War Risks**

40.—1. No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the vessel has been ordered to discharge either on signing Bills of Lading or thereafter, be or be declared blockaded or if shall be prohibited from port covered by this Charterparty as aforesaid shall enter, or after entry remain in any such port, destination, delivery or otherwise going by the Government of the Nation under whose flag the vessel sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charterparty as ordered by the Charterers (provided such other port is not a blockaded port) and shall be entitled to freight as if the vessel had discharged at the port or ports of discharge to which she was originally ordered.
2. The vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the vessel, the right to give such orders or directions. If by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

**Address Commission.**

41.—An address commission of ............ per cent. on gross freight, deadfreight, and demurrage is payable by Owners to ............ ~~Charterers having the right to deduct such commission from payment of freight and/or demurrage.~~
is paid, vessel lost or not lost.

**Brokerage Commission.**

42.—A brokerage commission of ............ 3.75 ............ %on gross freight, deadfreight, and demurrage is payable by Owners to ............ Stewart Alexander & Co., Inc. ............ SAIGHA CHARTERING CO OF COLORADO INC TO BE DEDUCED FROM FREIGHT PAYMENTS, plus 1.25% to others (guaranteeing to the Owners the due fulfilment at time of receiving freight payment and/or demurrage payments), vessel lost or not lost.

**Assignment**

43.—Charterers have the privilege of transferring/assigning/reletting all or part of this Charterparty to others (guaranteeing to the Owners the due fulfilment of this Charterparty.)

**Arbitration:**

44.—(a) New York. All disputes arising out of this contract shall be arbitrated at New York in the following manner, and be subject to U.S. Law:
One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.
In cases where the total amount claimed by either party does not exceed U.S. $3,500.00, or amount as mutually agreed, the Arbitration may be conducted in accordance with the Simplified Arbitration Procedure of the Society of Maritime Arbitrators, Inc. if so desired by both parties.

*Delete para. (a) or (b) as appropriate.*

(b) London. All ~~disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in the Shipping and/or Grain Trades, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action be taken before the award is made.~~

CLAUSES 45 TO 66 TO BE CONSIDERED PART OF THIS CHARTERPARTY.

FUR OWNERS:

FOR CHARTERERS: MDG JADE INVESTMENTS S.A.CURACAO

RIDER TO CHARTERPARTY DATED OCTOBER 8, 2004

M/V AUDE AS OWNERS , AND CHARTERERS.
MING JADE INVESTMENTS S.A. CURACAO.

-------------------------------------------------------------------

45.
The nominated vessel grain fitted and grain clean to U.S. Department of Agriculture
( U.S.D.A.) and National Cargo Bureau ( N.C.B. ) standards with valid grain booklet
on board, and Master will supply stability calculations that meet N.C.B. surveyor
requirements prior to loading and sailing.

Performing vessel to be approved by N.C.B. and U.S.D.A. only with regard to the
stability calculations and grain arrangement plan submitted by the Master prepared
in accordance with vessel's grain booklet and acceptable grain regulations.

46.
This cargo to be separated by the vessel's natural compartments.
Un natural separations between grades for Charterers time, risk and expense
but Owners guarantee maximum two (2) un natural separations all in holds
1 and 2, separations free of expense to Owners.

47.
This cargo is not to be trimmed by bulldozers or other mechanical trimming machines.
if shovel trimming is required, same to be done in Owners time and at Owners risk
and expense.

If stability calculations fail to allow the vessel to sail with slack holds/compartments,
securing of the cargo will be for Owners time, risk, and expense.

Should the vessel fail to meet N.C.B. loading requirements, Owners to assume any and
all additional time, risk, and expense necessary to meet such requirements including but
not limited to cost of transporting additional bulk barley malt to or from the grain
elevator, elevation, loading and cleaning charges.

48.
Any dues and/or taxes on cargo and/or freight or calculated against same, including
Harbor maintenance fees to be for Charterer's account. Any dues and/or taxes on vessel
including customary port charges to be for Owners account.

COPY

Page Two

49.
If vessel fails to tender within the laydays, Charterers have the option to cancel the vessel .

50.
Any damage which may be caused by the stevedores to the vessel at loading and discharging port(s) to be settled directly between the Master and respective stevedores. Charterers to use their best efforts to assist Owners to settle same. Notification must be received by the Charterers within 48 hours after the occurrence of the damage. A stevedoring damage report is to be issued prior to the vessel sailing from the port, and a copy of correspondence exchange in the incident must be forwarded promptly to the effective parties.

51.
All opening and closing of hatches at both ends of the voyage are to be done at the Owners expense, and time is to count as laytime.

52.
Vessel to be geared with cranes. Any expenses for hire of shore cranes necessitated by reason of failure of vessel's  gear to unload cargo will be for the account of the vessel's Owners.

53.
In case of the necessity of the vessel to wrap alone the berth, the cost are for the Owners account except loading or unloading time is to count.

54.
The Shippers and/or Receivers have the right to be onboard the vessel during loading and/or discharging operations, provided allowed by local/ state/ federal regulations. Visitors must have state/ government photograph identification.

55.
If Norgrain Bills of Ladings are issued, the arbitration clause in the Bill of Lading shall be changed to read Arbitration in New York and General Average in New York.

56.
a)  P&I
Owners guarantee that the vessel is fully covered with a first class IGA P and I club and also a first class hull & machinery underwriter having a valid certificate of financial responsibility (COFR) for the duration of this Charter.  The Owners P&I club is:



Page Three

Within 24 hours of fixing main terms, but always prior to loading the Owners or their P&I Club is to telex or fax to the Charterers confirmation that the vessel is entered in the Association for the current year and that there are not outstanding premiums due and that the vessel is not subject to any breach of the club rules. In case the Owners P&I Club fails to provide Charterers with proof of P&I Club cover for the duration of the charter, the Charterers have to option of cancelling this Charter party and hold Owners full responsible for misrepresentation and any loses incurred.

b) TERMS OF CREW'S EMPLOYMENT
If berthing, unberthing, sailing, loading or discharging is prevented or delayed by, or as a consequence of , any dispute arising from the terms and conditions of employment of the crew, any time lost by reason thereof shall not count during the continuation of such prevention or delay and the Owners shall reimburse Charterers / Shippers/Receivers for any proven damages and/or direct releated expenses caused thereby.

c) NO CHANGE IN DOCUMENTATION
The owners confirm that the vessel will not change name, flag, class, ownership or P&I Club or hull & machinery underwriters during the currency of this Charter party without Charterers prior consent.

d) SOLAS COMPLIANCE
The owners confirm that the vessel is in compliance with SOLAS regulations. The owners confirm that all the vessel's machinery and equipment; including cargo gear with motive power to drive then is working properly and has been working properly during previous voyages.

e) INACCESIBLE SPACES
The owners confirm that no cargo will be loaded in any inaccessible spaces.

f) NO PRIOR GENERAL AVERAGE DECLARATION
The owners confirm that the vessel has not declared GENERAL AVERAGE under present ownership and /or management.

g) PORT REGULATIONS/ITF COMPLIANCE
The owners confirm that the vessel will comply with all port and ITF requirements in the UNITED STATES OF AMERICA, and port of Destination, and any time lost or directly related expense due to non-compliance by vessel, owners , managers will be for the Owners account.



Page Four

h) BIMCO ISM CLAUSE
The BIMCO standard ISM clause for voyage and time Charter Parties is to be
incorporated into this Charter Party. "from the date of coming into force of the
International Safety Management (ISM) code in relation to the vessel and thereafter
during the currency of this Charter Party, the owners shall procure that both the vessel
and 'the company' (as defined by the ISM Code) shall comply with the requirements of
the ISM Code. Upon request the owners shall provide a copy of the relevant document
of compliance (DOC) and safety management certificate (SMC) to the Charterers.
Except as otherwise provided in this Charter Party, loss ,damage expense or delay
caused by failure on the part of owners of 'the company' to comply with the ISM code
shall be for the owners account. Non compliance with the requirements of this code
shall de deemed a breach of condition and a breach of this charter party.

i) FINANCIAL RESPONSIBILITY
The owners guarantee that the vessel has a CERTIFICATE OF FINANCIAL
RESPONSBILITY (COFR).

j)  CONDITIONS OF HOLDS
The owners are to present the vessel with clean washed and dried holds, ready in all
respects to load according to the prevailing local authorities , and to present NOTICE
OF READINESS (NOR) having all the required certificates and passes in order as per
particular UNITED STATES OF AMERICA, and destination discharge port regulations
as instructed by the nominated port agents.

57.
95% FREIGHT to be paid, less commissions, to Owners nominated bank account
within 3 (three) working days after signing and releasing of bills of ladings " marked
Freight payable as per charterparty..
Cargo deemed earned on loading, discountless nonreturnable ship and/or cargo lost not
lost, but always prior to breaking bulk for discharge. In all case clean on board bills of
ladings are to be issued, but the master has the right to reject any cargo that could cause
the clausing of bills of ladings

FREIGHT PAYABLE AS:
        J.P. Morgan Chase Bank N.A. 2 Penn Plaza, New York, New York
        Swift No. CHASUS33
        ABA # 021000021
        Account # 026039222
        In favor of:  Stewart Alexander & Co. Inc.
        Ref: M/v Audre / MING JADE INVESTMENTS S.A. C/p dtd 10/08/2004



Page Five

58.
Performing vessel to be MULTI PURPOSE type.

59.
At loading and discharging port, the Agents upon completion of loading/discharging to present to the Master and the Shippers respectively, Receivers or their local Representatives the Statement of Facts for their signature.

60.
Vessel to be required to have following :

Holds
- automatic sealed hatches
- cranes availability
- free of scorias, metal debris, wet paint or it solvents
- flooring openings must be sealed ( jute bags are not permitted)
- walls and floors in good maintenance condition and cleanliness

Ship
- maximum number of holds for this cargo
- last three cargoes vessel has carried
- vessel not to be allowed to transport materials with phenolics odors and trogoderms contaminated grains
- vessel to be in good general maintenance conditions

61.
The vessel is to be fumigated after loading with aluminum phosphide preparation with in transit fumigation to discharge port under the recirculation method for fumigation. Vessel to be suitable for in tansit fumigation of cargo. Crew need to vacate vessel for this fumigation.

62.
Owners to give estimated transit time of nominated vessel and give GA plan of vessel , with location of which holds to be loaded to Shippers and Receivers prior to loading.



Page  Six

63.
Vessel to load:

A full cargo of :

4000 metric tons NORTHERN SPRING WHEAT stowing about 44.5cft/mtons
 400 metric tons HARD RED WINTER WHEAT stowing about 44.5cft/mtons
 800 metric tons SOFT RED WINTER WHEAT  stowing about 44.5cft/mtons

Stowage as:

Hold 1  122,243cft          2347 metric tons NORTHERN SPRING
   Un natural separation           -    -    -    -
                             400 metric tons HARD RED WINTER
                                ( bottom forward in hold)


Hold 2  121,432cft          800 metric tons SOFT RED WINTER
   Un natural separation       -   -   -   -   -
                             1653 metric tons NORTHERN SPRING

Total cargo:    5,200 metric tons

64.
Balance of freight to be payable with settlement of demurrage and dispatch
within 15 days of Owners presentation of laytime statements.

65.
Charterers nominated agents at both loading and discharging ports, Owners
paying customary fees.  Gulf Harbor LLC Houston Texas and Guyana National
shipping corp.

66.
Any strapping/ securing/ bagging if required by National Cargo Bureau for
grain stability for Owners time, risk and expense.  Any trimming of cargo
required for grain stability for Owners account.



```
MV AUDRE
-------
TYPE OF VSL              : BOX SINGLEDECK OPENHATCH
CLASS                   : LLOYDS REGISTER
YEAR BUILT              : 1996 + 1997
FLAG                    : LITHUANIAN
P & I                   : CHARTERERS UK
GRT                     : 3893
NRT                     : 2533
DEADWEIGHT              : 5820
LOA                     : 102.83 M
BREADTH MOULDED         : 15.85 M
DEPTH MOULDED           : 8.10 M
SUMMER DRAUGHT          : 6.56 M
TYPE OF HATCHES         : MC.GREGOR FOLDING TYPE
NUMBER OF HOLDS/HATCHES : 2 / 2
BOWTHRUSTER             : YES
GEAR                    : 2 X 36 MT
CUBIC CAPACITY          : 243.675 CBFT GRAIN / BALE
CUBIC BREAKDOWN         : ABT : 1) 122,294   2) 121,481
ELECTRICAL VENTILATED   : YES + FERROSILICON FITTED
ICE CLASS               : SWEDISH/FINNISH 1A

HOLD 1: 31.80 X 12.80 X 8.50 / HATCH 1: 32.60 X 13.30
HOLD 2: 31.80 X 12.80 X 8.50 / HATCH 2: 32.60 X 13.30

ABT 13 KNOTS ON ABT 14 MT IFO 180 NDAS (LOADED + BALLAST)
ABT 1 MT MGO IN PORT WHEN IDLE / ABT 2 MT MGO IN PORT WHEN GEAR WORKING

ALL ABOVES ARE GIVEN IN GOOD FAITH BUT NOT GUARANTEED
```

